

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-28-2001

# USA v. Antico

Precedential or Non-Precedential:

Docket 00-1446

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"USA v. Antico" (2001). *2001 Decisions.* Paper 278.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/278

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 28, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 00-1446

UNITED STATES OF AMERICA

v.

FRANK ANTICO,
        Appellant

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Crim. No. 98-242-01)
District Judge: Honorable Jan E. DuBois

Argued: April 5, 2001

Before: SCIRICA, AMBRO AND GIBSON*
Circuit Judges

(Filed: November 28, 2001)

_____

*Honorable John R. Gibson, United States Circuit Judge for the Eighth
Circuit, sitting by designation.

Thomas Colas Carroll,
 Esquire (Argued)
Mark E. Cedrone, Esquire
Carroll & Cedrone
Suite 940 Public Ledger Building
150 S. Independence Mall West
6th and Chestnut Streets
Philadelphia, PA 19106

Attorneys for Appellant,
Frank Antico, Sr.

Michael R. Stiles, Esquire
United States Attorney,
 Eastern District of
 Pennsylvania

Robert E. Courtney, Esquire
Assistant United States Attorney
Chief, Organized Crime Division

Walter S. Batty, Jr., Esquire
Assistant United States Attorney

Richard P. Barrett, Esquire (Argued)
Assistant United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

Attorneys for Appellee, United States
of America

OPINION OF THE COURT

AMBRO, Circuit Judge:

Frank Antico, Sr. ("Antico") appeals his conviction and sentence in the United States District Court for the Eastern District of Pennsylvania ("District Court") on one count of racketeering in violation of 18 U.S.C. S 1962(c)--part of the Racketeer Influenced and Corrupt Organizations Act ("RICO"),1 nine substantive counts of extortion in violation

_____

1. Section 1962(c) provides that

of 18 U.S.C. S 1951 (known as the Hobbs Act), and eight substantive counts of wire fraud in violation of 18 U.S.C. S 1343.

On appeal, Antico asserts that he is entitled to a new trial for three reasons: (1) the District Court's failure to instruct the jury, during its charge on Hobbs Act extortion, of the necessity of finding an inducement or a quid pro quo; (2) the failure of the Government to prove a scheme to defraud the citizens of Philadelphia of their intangible right to his honest services; and (3) the insufficiency of the District Court's jury instruction on materiality as an element of wire fraud. We reject these allegations of error and affirm Antico's conviction on Counts One through Sixteen of the superseding indictment.

Antico also argues that his conviction of wire fraud on Counts Seventeen and Eighteen, which involve his securing permits for a prostitution business after he left the City of Philadelphia's Department of Licenses and Inspections, should be reversed as a result of the Supreme Court's ruling in Cleveland v. United States, 531 U.S. 12 (2000), that such a permit does not constitute property within the meaning of the wire fraud statute. We agree, and reverse Antico's conviction on these counts.

Finally, Antico challenges the District Court's enhancement of his sentence for a leadership role in an otherwise extensive criminal extortion activity and its loss computation on the wire fraud counts. In light of our reversal of conviction on two of the wire fraud counts, and

_____

        [i]t shall be unlawful for any person employed by or associated with
        any enterprise engaged in, or the activities of which affect, interstate
        or foreign commerce, to conduct or participate, directly or indirectly,
        in the conduct of such enterprise's affairs through a pattern of
        racketeering activity or collection of unlawful debt.

In order to find a pattern of racketeering activity, the Government must prove that at least two of the sixteen racketeering acts charged were connected by a common scheme, plan or motive, and that at least two of the racketeering acts were committed within ten years of each other (one of which occurred within the five year statute of limitations).

for other reasons stated in this opinion, we vacate Antico's
sentence and remand to the District Court for resentencing.

I. Factual and Procedural Background

Antico's indiscretions, which we summarize in this
section, expose a pervasive abuse of government services.
In the following recitation of the schemes on which Antico's
conviction was based, we construe the facts in the light
most favorable to the Government, as we must following the
jury's guilty verdict. Glasser v. United States , 315 U.S. 60,
80 (1942).

Between 1983 and January, 1996, Antico held various
positions at the Department of Licenses and Inspections
("L&I") for the City of Philadelphia (the"City"). L&I's
function is to administer and enforce the City's code
requirements, including building, electrical, fire, health,
housing, business, and zoning regulations. Officials of L&I
are empowered to issue zoning and use permits and
licenses according to a first-come-first-served policy,
conduct inspections, and enforce applicable codes and
regulations through citations and cease and desist orders.
Persons aggrieved by these decisions may appeal to the
Zoning Board of Adjustment ("ZBA"). Antico worked at L&I
at various times as a Zoning Examiner, a Code
Administrator, and the Business Regulatory Enforcement
Director. In these positions, he had the discretionary
authority to approve zoning and use permits and licenses,
and to cite and close businesses for violations of the City's
ordinances and the laws of Pennsylvania, particularly those
governing adult cabarets and topless bars. The extortion
and wire fraud schemes that Antico concocted while he was
a public official at L&I and after he left its employ are
detailed below.

A. Extortion Schemes -- RICO Acts 1-13, 15, 16 and
Extortion Counts 2-10

1. Extortion of Westside Check Cashing

On December 22, 1994, L&I closed for zoning violations
one of Westside Check Cashing's stores, located at 5th and
Lehigh Avenues in Philadelphia. The controller of the check

4

cashing business met with Antico the next day to discuss reopening the business. Antico explained that Westside had to file a new application for a zoning and/or use registration permit and make other changes.

Several days later, Antico called the controller and the owner of the business and told them he wanted a piece of jewelry to give to his wife for their anniversary. They selected some items, including a diamond pendant appraised at $3,275, and sent them to Antico's office by courier. The owner and his controller testified that they decided to send the jewelry to Antico and not bill him for it because of Antico's position with L&I. The zoning issue that led to the store closing on December 22 was still pending and they were concerned that Antico would use his position with L&I to keep the business closed. They understood from their conversation with Antico that he did not intend, nor did he ever offer, to pay for the jewelry. Once the conditions of the permit were satisfied, Antico permitted the store to reopen.

2. Extortion of Maureen McCausland2

Maureen McCausland met Antico in 1983 when Antico was working in L&I's zoning section. McCausland approached Antico to obtain a zoning and/or use permit registration for a prostitution business at 2132 Market Street in Philadelphia. Her zoning application read"nude modeling studio" and Antico advised her instead to call the business a "modeling studio" on the application. McCausland did so, and she received the license. She later paid Antico $500 for getting the permit for her.

This began a pattern of Antico receiving payments from McCausland for approval of zoning and/or use registration permits for a number of other prostitution businesses she opened over the years. She paid Antico $500 when she applied for the permit and $500 when she received it. McCausland also paid Antico additional sums of money and had sex with him so that he would use his position at L&I
_____

2. The Maureen McCausland extortion scheme was charged as a racketeering act but not a separate, substantive Hobbs Act extortion count.

5

to protect her business. For example, when Antico was placed in charge of enforcement, he alerted her to the police department's efforts to close her business. McCausland estimated that Antico extorted approximately $8,000 from her during the period covered by the superseding indictment.

McCausland's testimony was corroborated by the applications for zoning and use registration permits introduced into evidence. These applications were prepared by Antico and listed the use as "modeling studio" or "physical therapy."

3. Extortion of Adult Cabarets in Philadelphia--
        Wizzards, Pin Ups, Tattletales and Teazers

Between 1993 and 1995, Antico served as the Business Regulatory Enforcement Director for L&I, supervising the unit that enforced compliance with the zoning code. Most pertinent to this scheme, Antico was responsible for regulating adult cabarets and their compliance with the zoning code.

The Philadelphia Code defines an adult cabaret as"[a]n adult club, restaurant, theater, hall or similar place which features topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators or similar entertainers exhibiting specified anatomical areas or performing specified sexual activities." Philadelphia Code S 14-1605. A business that meets this definition is considered a regulated use and is prohibited from operating within 1,000 feet of another regulated use or within 500 feet of a residential area. According to L&I policies, all adult cabarets are required to be licensed or to receive a variance from the ZBA. In addition, the dancers at a licensed cabaret (or a cabaret permitted to operate as such while it sought a license) cannot perform in a lewd or obscene manner.3

_____

3. L&I incorporated the Philadelphia Code definition of obscenity in determining what constituted a lewd performance by a dancer. See Philadelphia Code SS 10-1100 through -1103. Dancers were thereby prohibited from touching patrons and participating in actual or simulated sexual acts on stage. Additionally, the dancers were required to wear bottoms and latex pasties to cover their breasts.

a. Wizzards

The scheme with respect to Antico's extortion of Wizzards began with John Messina, John Meehan, and Frank Antico, Jr. (Antico's son) forming Pan Enterprises, Inc. to operate Wizzards, an adult cabaret located at 38th and Chestnut Streets in Philadelphia. Initially, Messina provided the start-up money and held 89% of the corporation. Messina gave 10% and the manager position to Meehan because of his experience in operating topless clubs. Meehan, in turn, introduced Messina to Antico, Jr.

Meehan and Antico, Jr. told Messina that if Antico, Jr. received a 1% interest in Pan Enterprises and a position as a weekend manager, defendant Antico would use his position with L&I to help Wizzards operate. Messina agreed to this arrangement and to paying Meehan and Antico, Jr. part of their weekly salaries in cash without reporting it to the taxing authorities.

Antico guided Wizzards through the permitting and licensing process at L&I. In addition, when Wizzards opened for business on September 23, 1993, Antico arranged to have two competing clubs shut down for code violations. After Wizzards opened, Antico frequented the club and received complimentary drinks, food, and parties for himself and his friends. While Antico was present, the dancers violated the code restrictions on lewd dancing, yet Antico issued neither citations nor cease and desist orders.

After operating Wizzards for a few months, Messina and other investors began to quarrel with Meehan and Antico, Jr. over the club's management. Although the club was crowded and appeared to be doing well, the books did not reflect this success. When Messina and the investors tried to take a more active role in the club's management, Meehan and Antico, Jr. objected and threatened to have L&I shut the club down. In fact, in March 1994, Antico came into the club and closed it down because the dancers were performing in a lewd manner. A former employee of Wizzards testified that Meehan told that employee that he knew the club would be shut down, but would be permitted to reopen the next day. According to this employee, Meehan was "flexing his muscles."

7

In June 1994, Eugene Johnson took over Messina's ownership interest in Wizzards as repayment of a debt. Johnson brought in Dorothy Davis from his New Jersey establishment to observe how Meehan and Antico, Jr. operated the club. Davis reported that most of the employees, including Meehan and Antico, Jr., were getting paid cash under the table, that Antico, Jr. was being paid a large salary for doing very little, and that the dancers were performing in violation of the L&I policies. Johnson instructed Davis to put all employees on the books, cut Antico, Jr.'s salary or fire him, and require all dancers to conform to L&I restrictions on dancing.

When Davis informed Meehan of these instructions, Meehan responded that Antico, Jr.'s father was the head of L&I and that Wizzards was operating at his mercy. On June 16, 1994, Meehan and Antico, Jr. resigned their employment with Wizzards. Within two hours defendant Antico closed Wizzards for lewd dancing.

b. Pin Ups

In August of 1995, Antico, Antico, Jr., and Meehan met with the owners of Pin Ups to discuss the sale of the club to Antico, Jr. and Meehan. At a follow-up meeting, the owners turned down the offer made by Antico, Jr. and Meehan. Two weeks later, on September 8, 1995, L&I inspectors arrived at Pin Ups, conducted an inspection and closed the club for electrical violations.

Prior to the closure, some of the Pin Ups dancers knew the club was going to be shut down and arranged to dance at Tattletales, another topless club located nearby. The owners of Tattletales also knew that Pin Ups was going to be shut down and arranged for additional staffing and liquor for the night.

On the night of the inspection, one of the owners of Pin Ups, suspecting that the closure was in response to their refusal to sell the club, told defendant Antico that if Pin Ups was not reopened the next day, he was going to "call the Feds." Antico permitted Pin Ups to reopen before the electrical violations were corrected.

c. Tattletales

Steve Owens and Greg Bertino opened Tattletales in July 1995. Antico was a regular customer and advised the two

8

on the Code and the obscenity rules. Antico took them to
other topless clubs to view couch dancing and urged them
to put a couch dancing room into Tattletales. Antico told
them to call him if they ever had any problems.

Despite Antico's advice, the dancers at the club did not
follow the dancing restrictions or the Code. Antico,
however, did not cite the club for violations. Instead, he
was treated to free drinks, meals, and couch dances.
Owens and Bertino did this to gain favor with Antico and to
maintain good relations with L&I. The two also gave Antico
$500.

d. Teazers

Thomas Killeen was an owner of Teazers, a topless club
located at 20th Street and Oregon Avenue in Philadelphia.
In connection with the opening on September 23, 1993 of
Wizzards, Antico closed Teazers and another bar owned by
Killeen because the dancers were violating L&I restrictions.

Subsequent to its reopening, Antico began to patronize
Teazers. Killeen would socialize with Antico and give him
free drinks. Antico eventually asked Killeen for, among
other things, the repeated use of one of Killeen's limousines
from his limousine company. Killeen acquiesced because of
Antico's position in L&I and never billed him for the use.
Killeen ultimately hired limousines from other companies
because he did not want Antico to be seen in one of his
vehicles. In addition, Antico asked for, and Killeen let him
use, six field-level box seats for several Phillies games.
Antico gave Killeen a list of games he wanted to attend and
sent an L&I employee to pick up the tickets.

4. Beach Club

Frank Cascerceri was the owner of the Beach Club, a
nightclub formerly located along the Delaware River in
Philadelphia. Cascerceri testified that he built a pool at the
club and hired an expediter[4] to apply for permits from L&I.

_____

4. Expediters are independent contractors who, in exchange for a fee,
represent individuals and businesses before L&I and the ZBA. Expediters
typically prepare the paperwork required to obtain permits, licenses, or
variances by L&I or the ZBA. Expediters may interact with employees of
L&I during the process, and appear at public hearings before the ZBA.

The expediter prepared the necessary application and filed it with L&I. Because the club was scheduled to open in the Spring of 1993, Cascerceri became frustrated when L&I delayed issuing the permit. He called Antico and explained the urgency of getting the permit. Antico told him that he was using the wrong expediter, and that he should hire Elizabeth Ricciardi[5] to expedite his application for the permit. Antico spoke to Ricciardi before Cascerceri did and urged her to take the employment.

To avoid the risk of not getting L&I approval, Cascerceri hired Ricciardi. He paid her $625 for her assistance, although Ricciardi testified that she did very little to obtain the permit. Shortly after he hired Ricciardi, Cascerceri received his approval from L&I.

5. Extortion of Barbara Williams[6]

Barbara Williams worked as an expediter in Philadelphia from 1984 to 1989. To circumvent L&I's first-come-first-served rule of processing applications, Williams would turn to Antico on her urgent matters and pay him to process her paperwork ahead of others. She also paid Antico to prepare particularly complex zoning applications. Typically, Williams would give Antico batches of permits to process at one time, and paid him according to the number of applications he processed. The payments ranged from $30 to $75 per application. Williams estimated that Antico extorted approximately $5,000 from her during her work as an expediter.

B. Mail and Wire Fraud Scheme Involving Elizabeth Ricciardi -- RICO Acts 14A-F and Wire Fraud Counts 11-16

Antico's employment with L&I required him to refrain from using his position to secure advantages for himself or his family members. The Philadelphia Code provides that

_____

5. Ricciardi is the subject of the mail and wire fraud racketeering acts and the substantive wire fraud offenses in Counts 11-16. See the discussion of the Ricciardi mail and wire fraud schemes, infra at part I.B.

6. The Barbara Williams extortion scheme was charged as a racketeering act but not a separate Hobbs Act extortion count.

10

city employees must disclose publicly a conflict of interest and recuse themselves from taking any official action in a matter where they have a financial interest.7 In addition, state ethics laws prohibited him from using his employment for private pecuniary gain.8  See 65 Pa. C.S.A. SS 401-409, repealed by P.L. 729, No. 93, S 6(a)(2) (Oct. 15, 1998), and replaced with 65 Pa. C.S.A. SS 1101.1-1108. These code provisions are implicated by Antico's arrangement with Elizabeth Ricciardi.

In the late 1980s, Ricciardi had two children by Antico. Initally, Antico failed to make child support payments, forcing Ricciardi to file a child support petition in the Philadelphia Court of Common Pleas, Family Court

_____

7. Section 20-607 of the Philadelphia Code, titled Conflict of Interest, states in relevant part:

Unless there is public disclosure and disqualification . . . , no City
officer or employee shall be financially interested in any legislation,
including ordinances and resolutions, award, contract, lease, case,
claim, decision, decree or judgment made by him in his official
capacity . . ., nor shall any financial interest be held by a parent,
spouse, child, brother, sister or like relative-in-law, or by any
person, firm, partnership, corporation, business association, trustee
or straw party for his or her benefit.

8. The State Ethics Act provides that "[n]o public official or public employee shall engage in conduct that constitutes a conflict of interest." 65 Pa. C.S.A. S 403. The Ethics Act defined a conflict of interest as follows:

Use by a public official or public employee of the authority of his
office or employment or any confidential information received
through his holding public office or employment for the private
pecuniary benefit of himself, a member of his immediate family or a
business with which he or a member of his immediate family is
associated. "Conflict" or "conflict of interest" does not include an
action having a de minimis economic impact or which affects to the
same degree a class consisting of the general public or a subclass
consisting of an industry, occupation or other group which includes
the public official or public employee, a member of his immediate
family or a business with which he or a member of his immediate
family is associated.

65 Pa. C.S.A. S 402. The statute currently in effect is virtually identical
to the provision cited above. See 65 Pa. C.S.A. S 1102.

11

9. The Philadelphia Sign Company, located in New Jersey, was one of Ricciardi's clients. Telephone calls from Ricciardi in Philadelphia to the client in New Jersey on six separate occasions in December of 1993 serve as the basis for the substantive wire fraud offenses in Counts Eleven through Sixteen. The use of the mails with respect to the same client constituted the mail fraud racketeering acts proven as predicate acts under the RICO Count.

Division. The child support order at that time was $60 per week. Antico volunteered to pay child support if Ricciardi would withdraw the petition, which she agreed to do. He made three payments, then stopped.

In lieu of the payments, Antico offered to establish Ricciardi as an expediter. She was reluctant to accept, knowing nothing about the expediting business, but Antico told her that he would take care of everything. This was not an empty promise. Antico referred clients to Ricciardi who needed licenses and permits from L&I. Ricciardi would call Antico when a client hired her. Antico would then tell Ricciardi how to fill out the applications or would complete them himself. Ricciardi was known to use Antico's office at L&I to do her work, and he would have city employees pick up and deliver her paperwork and watch her children. Antico personally worked on 564 of the 748 building permit, and 288 of the 322 zoning permit, applications filed by Ricciardi and submitted them under her name. 9 Moreover, Antico was the one who approved the permits and applications submitted by her business. Antico neither publicly disclosed a conflict of interest nor disqualified himself from taking official action in these matters, as required by Section 20-607 of the Philadelphia Code. As a result of this arrangement, Ricciardi admits to earning over $700,000 during the course of the arrangement.

In 1993, upon discovering that Antico was signing permit applications on behalf of Ricciardi, L&I Commissioner Levin transferred Antico and moved the responsibility for permit approvals to a different manager. Antico was no longer the head of the zoning department, and his job responsibilities no longer included approving permit applications.

12

C. Wire Fraud Scheme Involving Maureen McCausland
     Counts Seventeen and Eighteen10

In January 1996, Antico left L&I and established an expediting business in Philadelphia under the name Frank P. Antico, Zoning Consultant, Advisor, and Technician of the Philadelphia Code. In 1997, Maureen McCausland requested Antico's services to reopen a prostitution business. Unbeknown to Antico, McCausland was cooperating with the Federal Bureau of Investigation ("FBI") at the time and this request was part of a Government operation. Antico assisted McCausland with her permit application, which declared the facility to be a modeling studio/physical fitness business at 1212 Walnut Street, Philadelphia.11 Antico attempted to hide his involvement by having another expediter submit the applications.

* * * * *

On September 30, 1998, a federal grand jury in the Eastern District of Pennsylvania returned an eighteen count superseding indictment. The Government charged Antico with sixteen racketeering acts under the umbrella of one RICO count (Count One), nine of which were also charged as substantive Hobbs Act extortion counts (Counts Two through Ten), and six of which were charged as substantive wire fraud counts (Counts Eleven through Sixteen). Antico was charged with two additional substantive wire fraud counts (Counts Seventeen and Eighteen) that do not fall under the RICO umbrella count. The jury convicted Antico of all eighteen counts in the superseding indictment. With respect to the RICO count, the jury concluded that fifteen of the sixteen predicate racketeering acts were proven.12

_____

10. The Maureen McCausland wire fraud scheme charged in Counts Seventeen and Eighteen is not part of the RICO Count.
11. The two communicated via interstate phone calls to set up meetings to discuss the application and how to circumvent the L&I regulations. These conversations were taped by the FBI.
12. The jury concluded that Racketeering Act 2 was not proven. This act, which occurred in March 1993, was the exchange of $500 for obtaining the zoning and/or use registration permit that falsely declared that McCausland operated a "modeling studio" at 2132 Market Street. However, this is not fatal to the conviction on the RICO count because the jury concluded that Racketeering Acts 3 through 6, which pertained to the same extortion scheme involving McCausland, as well as Racketeering Acts 7 through 16, were proven.

13

On April 28, 2000, Antico was sentenced to terms of sixty-three months imprisonment on Counts One through Ten (RICO and extortion) and to terms of sixty months imprisonment on Counts Eleven through Eighteen (wire fraud). All terms were to be served concurrently. 13 In addition, Antico was sentenced to three years supervised release, ordered to pay a fine of $10,000 and a special assessment of $1,000, and ordered to forfeit $52,900.

II. Legal Discussion

This Court has jurisdiction of an appeal from a judgment of conviction and sentencing pursuant to 28 U.S.C.S 1291. On appeal, Antico alleges three points of trial error and challenges his sentence on two grounds. We address each allegation of error in turn.

A. Requirement of Inducement or Quid Pro Quo  in Hobbs
      Act Extortion

Antico challenges the District Court's instructions to the jury with respect to Hobbs Act extortion under "color of official right." The Hobbs Act provides in relevant part:

> (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

> (b) As used in this section--

> . . .

> (2) The term `extortion' means the obtaining of property from another, with his consent, induced

_____

13. The District Court grouped for sentencing purposes the RICO and extortion counts in one group and the wire fraud counts in a second group. It then imposed a sentence based on the groups rather than on the individual counts.

14

> by wrongful use of actual or threatened force,
> violence, or fear, or under color of official right.

18 U.S.C. S 1951 (emphasis added). Thus, the statute supports two classes of extortion: extortion induced by "wrongful use of force" and extortion "under color of official right."14 The latter is at issue in this case.

Specifically, Antico argues that the District Court should have charged the jury to determine whether he induced his extortion victims into giving him gifts and favors with a promise or threat of an official act in return or, at a minimum, that a quid pro quo was reached between them. This Court exercises plenary review over the alleged failure of the District Court to charge the jury properly on a matter of law. United States v. Bradley, 173 F.3d 225, 230 (3d Cir. 1999).

1. Inducement

With respect to Antico's claim that an inducement instruction should have been charged to the jury as per subsection (b)(2) of the Hobbs Act, the Supreme Court in Evans v. United States, 504 U.S. 255 (1992), clearly rejected inducement as an element of the offense of extortion "under color of official right." Id. at 256. The Supreme Court affirmed the ruling of the Court of Appeals for the Eleventh Circuit, which held that

> the requirement of inducement is automatically
> satisfied by the power connected with the public office.
> Therefore, once the defendant has shown that a public
> official has accepted money in return for a requested
> exercise of official power, no additional inducement
> need be shown. The coercive nature of the official office
> provides all the inducement necessary.

_____

14. See United States v. Jannotti, 673 F.2d 578 (3d Cir. 1982) (ruling Hobbs Act covers actions by public officials under color of official right even when the payment is not obtained by force, threats nor use of force); United States v. Margiotta, 688 F.2d 108, 130-31 (2d Cir. 1982) ("The public officer's misuse of his office supplies the necessary element of coercion, and the wrongful use of official power need not be accompanied by actual or threatened force, violence or fear.").

United States v. Evans, 910 F.2d 790, 796-97 (11th Cir. 1990). Relying on the common law of extortion, the Supreme Court agreed and held that "the word `induced' is a part of the definition of the offense by the private individual, but not the offense by the public official. . . . The statute merely requires of the public official that he obtain `property from another, with his consent, . . . under color of official right.' " Evans, 504 U.S. at 265. Thus, Antico's claim that an inducement instruction should have been given fails.

2. Quid Pro Quo

Antico also asserts that the District Court should have charged the jury to find a specific quid pro quo . He cites to a trilogy of Supreme Court cases -- McCormick v. United States, 500 U.S. 257 (1991), Evans v. United States, 504 U.S. 255, and United States v. Sun Diamond Growers of Cal., 526 U.S. 398 (1999) -- in support of his argument.

Antico begins by citing to the cornerstone Supreme Court case on Hobbs Act extortion--McCormick, which held that an explicit quid pro quo is necessary for conviction under the Hobbs Act when a public official receives a campaign contribution. In McCormick, the Supreme Court ruled that the District Court erred by instructing the jury that such a quid pro quo was not necessary. McCormick 500 U.S. at 274.15

The logic the Supreme Court employed in McCormick follows the fine line between what is legal campaign activity and the "forbidden zone of conduct."

> [T]o hold that legislators commit the federal crime of
> extortion when they act for the benefit of constituents
> or support legislation furthering the interests of some
> of their constituents, shortly before or after campaign
> contributions are solicited and received from those

_____

15. The District Court's instructions in McCormick did not omit passively a quid pro quo element, as the District Court did in the case before us. Instead, the District Court affirmatively stated that "it is not necessary that the government prove that the defendant committed or promised to commit a quid pro quo, that is, consideration in the nature of an official action in return for the payment of the money not lawfully owed." Id. at 261 n.4 (emphasis added).

16

beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent,"under color of official right." To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation. It would require statutory language more explicit than the Hobbs Act contains to justify a contrary conclusion.

Id. at 272-73.

Because the line is so subtle, the Supreme Court ruled in McCormick that an overt quid pro quo is a necessary proof in the context of campaign contributions.

The receipt of such contributions is also vulnerable under the Act as having been taken under color of official right, but only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act. In such situations the official asserts that his official conduct will be controlled by the terms of the promise or undertaking. This is the receipt of money by an elected official under color of official right within the meaning of the Hobbs Act.

Id. at 273.

Antico appears to favor extending the McCormick explicit quid pro quo ruling to non-elected public employees outside the context of campaign contributions because the state of mind necessary to convict in the two contexts is the same. However, the Supreme Court noted that its holding was limited to campaign contributions.

McCormick does not challenge any rulings of the courts below with respect to the application of the Hobbs Act to payments made to nonelected officials or to payments made to elected officials that are properly determined not to be campaign contributions. Hence, we do not consider how the "under color of official

17

right" phrase is to be interpreted and applied in those contexts.

Id. at 268-69. In light of this express limitation, we decline Antico's invitation to extend McCormick to apply to his situation. The quid pro quo can be implicit, that is, a conviction can occur if the Government shows that Antico accepted payments or other consideration with the implied understanding that he would perform or not perform an act in his official capacity "under color of official right."

In Evans, decided one year after McCormick, the Supreme Court ruled that a jury instruction containing an implicit, as opposed to an explicit, quid pro quo requirement in the context of campaign contributions passed muster under McCormick. The Supreme Court stated:

> We reject petitioner's criticism of the instruction, and conclude that it satisfies the quid pro quo requirement of McCormick v. United States, because the offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the quid pro quo is not an element of the offense. . . . We hold today that the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.

Evans, 504 U.S. at 268. In other words, no"official act" (i.e., no "quo") need be proved to convict under the Hobbs Act. Nonetheless, the official must know that the payment -- the "quid"-- was made in return for official acts.

Outside the campaign contribution context, where Antico's case falls, the line between legal and illegal acceptance of money is not so nuanced. The Hobbs Act simply states that use of one's office to obtain money or services not due is extortion: "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." Id. Antico would read into the phrase "knowing the payment was made in return for official acts" a requirement that the jury be instructed using the express words "quid pro quo."

18

We echo the Supreme Court's satisfaction with an implicit quid pro quo requirement. In United States v. Bradley, 173 F.3d 225 (3d Cir. 1999), we considered the question of whether, in a non-campaign contribution Hobbs Act extortion case, an express agreement must be shown. Relying on Justice Kennedy's concurrence in Evans, we agreed that " `the official and the payor need not state the quid pro quo in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods.' " Bradley, 173 F.3d at 231 (citing Evans, 504 U.S. at 274).

In addition, we rejected Antico's argument when we affirmed, in part, the District Court's holding in United States v. McDade, 28 F.3d 283 (3d Cir. 1994), affirming in part and dismissing on other grounds, 827 F. Supp. 1153 (E.D. Pa. 1993). Analyzing both the McCormick and Evans cases, the District Court in McDade concluded that "[g]iven the language of the Supreme Court's opinion, I find that McCormick does not require a quid pro quo for extortion outside the context of campaign contributions." 827 F. Supp. at 1171; accord United States v. Davis, 967 F.2d 516 (11th Cir. 1992). "[S]ince I can find no language in the Opinion of the Court in Evans which explicitly extends the quid pro quo requirement, and since the facts of Evans did not require the Court to extend McCormick, I respectfully do not interpret the Court's opinion so broadly as did those concurring and dissenting Justices [in Evans ]." McDade, 827 F. Supp. at 1171 n.8. We reiterate our agreement with McDade.

The relevant inquiry is whether the District Court's instruction satisfied the implicit quid pro quo requirement where non-campaign contribution Hobbs Act "color of official right" extortion is charged. A closer look at Evans' language on quid pro quo, as well as Bradley and McDade and the District Court's decision, all of which dealt with "color of official right" Hobbs Act extortion outside the campaign contribution context, lead to the conclusion that the District Court did not err in its jury charge. The proper instruction, as per the Evans Court, is"that the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." 504

19

U.S. at 268. The jury instruction we affirmed in Bradley reads as follows:

> So if a public official agrees explicitly or implicitly to take or withhold some action for the purpose of obtaining money for someone else, that constitutes extortion. The public official need not fulfill the promise of the payor to do or not to do an official act, although the official's failure to influence may be considered along with all of his conduct in determining whether or not he possessed the intent to commit the crime. The crime is completed at the time when the public official knowingly accepts the benefit in return for his agreement to perform or not to perform an act related to his office. Moreover, the government does not have to prove that there was an express promise on the part of the public official to perform a particular act at the time of the payment.
>
> In sum then, it is sufficient if the public official understands that he is expected, as a result of the payment, to exercise particular kinds of influence or to do certain things connected with his office as specific opportunities arise.

Bradley, 173 F.3d at 231 (emphasis added).

The District Court's charge to the jury in Antico's case, after specifically reading the relevant portions of the Hobbs Act, was as follows:

> Extortion under color of official right is the use of one's position as a public official or the authority of public office to obtain money or services not due the official or his public office. Such extortion violates the Hobbs Act.
>
> . . .
>
> If you decide that the defendant was given money or goods or services not due the office he represents, you must then decide whether the defendant used the authority of his office or position to obtain the money, goods or services. The third element is wrongful obtained consent of the giver. The Government must prove beyond a reasonable doubt that these items were

20

given to the defendant in connection with his power and authority as a public official.

The giver may have initiated the exchange and the parties may be on friendly terms. These are factors to be considered in deciding whether the giver gave the payments, goods or services because he believed the defendant would use his office for acts not properly related to his official duty or whether instead the giver was making a voluntary contribution.

Unless you decide beyond a reasonable doubt that the defendant knew the giver's consent was wrongfully obtained, that is, that the money, goods or services were given in connection with the defendant's misuse of his official position rather than being given voluntarily, you cannot convict the defendant.

(Emphases added).

No specific instruction to find an express quid pro quo was given. Nor did the District Court specifically negate such a requirement as the trial court did in McCormick. As the District Court noted, "I didn't not grant the Government's points, by the way, . . . which asked me to charge that no quid pro quo was required and no inducement was required. I just didn't charge it." Antico argues that a jury instruction failing to mention quid pro quo falls short of the mark.

We disagree with Antico's interpretation of the Supreme Court's intent. Considering the District Court's instructions as a whole, and the highlighted phrases in particular, which require a finding of Antico's knowledge of a "connection" between the payment and the misuse of his office, we find that they sufficiently convey the implicit quid pro quo approved in Evans and Bradley. As a result, the District Court did not err in its charge to the jury. If Antico knew that payments or other consideration were extended to him to secure unwarranted favorable treatment in his official capacity, he is guilty of Hobbs Act extortion under color of official right without the need to prove that the official action (or inaction) occurred.

Lastly, Antico cites to the recent case of United States v. Sun Diamond Growers of Cal., 526 U.S. 398 (1999), as an

21

affirmation that the Supreme Court has retreated from its holding in Evans and returned to the position in McCormick that an express quid pro quo must be found. Notably, however, the Sun Diamond case was brought under the federal gratuity statute, 18 U.S.C. S 201(b)(2), not the Hobbs Act. The crime of illegal gratuity "requires a showing that something of value was given, offered, or promised to a public official (as to the giver), or demanded, sought, received, accepted, or agreed to be received or accepted by a public official (as to the recipient), for or because of any official act performed or to be performed by such public official." Id. at 404. The Supreme Court reasoned that "[t]he insistence upon an `official act,' carefully defined, seems pregnant with the requirement that some particular official act be identified and proved." Id. at 406.

As a result, the Court held in Sun Diamond that, "in order to establish a violation of 18 U.S.C. S 201(c)(1)(A), the Government must prove a link between a thing of value conferred upon a public official and a specific `official act' for or because of which it was given." Id. at 414. Again, noting the subtle distinction between what is legal campaign activity and the "forbidden zone of conduct," the Supreme Court recognized the peculiar results if it were to convict without a finding of any connection between the public official's intent and a specific official act. "It would criminalize, for example, token gifts to the President based on his official position and not linked to any identifiable act -- such as the replica jerseys given by championship sports teams each year during ceremonial White House visits." Id. at 406-07. Thus, in the context of campaign contributions under the illegal gratuity statute, Sun Diamond requires proof of a specific "quo," which Antico argues necessitates an express quid pro quo jury instruction.

In contrast to the illegal gratuity statute, the Hobbs Act, as interpreted by both the Supreme Court and our Court, contains no express quid pro quo requirement in the non-campaign contribution context. The concerns over illegal campaign contributions addressed by the gratuity statute and the Hobbs Act -- solved by an express quid pro quo requirement in those cases -- do not automatically carry over to the line of cases dealing with Hobbs Act extortion as

22

it pertains to non-elected officials. Accordingly, we do not read Sun Diamond to require a heightened quid pro quo jury instruction, distinct from that outlined in Evans, in this case. Because the District Court's jury instruction comports with that in Evans and Bradley, we reject Antico's allegation of error in this respect.

B. Intangible Rights of Honest Services

1. Sufficiency of the Government's Proof

The jury found that the Government had proven all of the mail and wire fraud racketeering acts under the RICO count and found Antico guilty of all of the substantive counts of mail and wire fraud. On appeal, Antico challenges the sufficiency of the evidence with respect to the fraudulent schemes. Again, sufficiency of the evidence is reviewed in a light most favorable to the Government following a jury verdict in its favor. Glasser v. United States, 315 U.S. 60, 80 (1942). "We must sustain the verdict if there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision. . . . We do not weigh evidence or determine the credibility of witnesses in making this determination." United States v. Beckett, 208 F.3d 140, 151 (3d Cir. 2000) (citations omitted). The scope of review is over the totality of the evidence, both direct and circumstantial. United States v. Czubinski, 106 F.3d 1069, 1073 (1st Cir. 1997).

In relevant part, the mail and wire fraud statutes provide:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . [uses the mails or wires, or causes their use] for the purpose of executing such scheme or artifice . . . shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. SS 1341 & 1343. To prove mail or wire fraud, the evidence must establish beyond a reasonable doubt (1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of the mails or interstate wire communications in furtherance of the scheme. United

23

States v. Clapps, 732 F.2d 1148, 1152 (3d Cir. 1984).
Identical standards apply to the "scheme to defraud" under
both the mail and the wire fraud statutes. United States v.
Boots, 80 F.3d 580, 586 n.11 (1st Cir. 1996).

Courts have interpreted the term " `scheme or artifice to
defraud' [to] include a scheme or artifice to deprive another
of the intangible right of honest services," United States v.
Woodward, 149 F.3d 46 (1st Cir. 1998) (citing United States
v. Sawyer, 85 F.3d 713, 723-24 (1st Cir. 1996)), giving rise
to the "intangible rights doctrine."16 This doctrine reaches
public and private fraud at the state and local levels,
including prosecutions of public officials or employees who
have failed to provide honest services to the citizenry they

_____

16. The intangible rights doctrine gradually developed as courts of
appeals interpreted the mail fraud statute since its origin in the late
1800s. In 1987, the Supreme Court overturned decades of mail and wire
fraud jurisprudence in McNally v. United States , 483 U.S. 350 (1987),
when it held that the mail and wire fraud statutes do not prohibit
schemes to defraud individuals of their intangible right to honest
government services. In response, Congress enacted the honest services
amendment the next year. It provides: "For the purposes of this chapter,
the term `scheme or artifice to defraud' includes a scheme or artifice to
deprive another of the intangible right of honest services." 18 U.S.C.
S 1346 (effective Nov. 11, 1988). Section 1346 was enacted without much
comment and little legislative history. However, commentary and judicial
reflection indicate that the statute was enacted to overturn McNally and
restore the evolution of mail and wire fraud to its pre-McNally status.
See 134 Cong. Rec. H11,251 (daily ed. Oct 21, 1988) (statement of Rep.
Conyers) ("This amendment restores the mail fraud provision to where
that provision was before the McNally decision."); Id. at S17,376 (daily
ed. Nov. 10, 1988) (statement of Sen. Biden) ("This section overturns the
decision in McNally v. United States. . . . Under the amendment, those
statutes will protect any person's intangible right to the honest services
of another, including the right of the public to the honest services of
public officials."); Cleveland v. United States, 531 U.S. 12, 20 (2000)
(noting "Congress amended the law specifically to cover one of the
`intangible rights' that lower courts had protected under S 1341 prior to
McNally: `the intangible right of honest services' "); United States v.
DeVegter, 198 F.3d 1324, 1327 (11th Cir. 1999) (noting that " `Congress
passed [S 1346] to overrule McNally  and reinstate prior law' ")
(alteration
in original); United States v. Grandmaison, 77 F.3d 555, 556 (1st Cir.
1996) (same, citing cases).

serve.17 Although our interpretation of the scope of the mail and wire fraud statutes is not boundless, we have construed a "scheme or artifice to defraud" to encompass intangible rights. Clapps, 732 F.2d at 1149-53 (affirming the conviction of a county political party chairman who defrauded nursing home residents of their absentee ballots and marked them in favor of the party's candidate); United States v. Frankel, 721 F.2d 917, 920-21 (3d Cir. 1983) ("Schemes to defraud come within the scope of the statute even absent a false representation."); United States v. Boffa, 688 F.2d 919, 931 (3d Cir. 1982) (concluding that a scheme to defraud employees "of the loyal, faithful, and honest services of their union official alleges a crime within the scope of the mail fraud statute"). Given Congress' clear intent in enacting S 1346, we join with those courts that recognize that the scope of the amendment includes the prosecution of state and local officials and public employees for depriving the citizens they serve of their right to honest services.18

_____

17. See, e.g., Woodward, 139 F.3d 46 (affirming the conviction for mail and wire fraud on the "theft of honest services" theory where legislator, serving on the Joint Committee on Insurance, accepted illegal gratuities from insurance industry lobbyist); United States v. Silvano, 812 F.2d 754 (1st Cir. 1987) (applying the mail fraud statute to local political corruption and affirming the conviction of a Boston city official who secretly arranged for a friend to receive commissions from the city's choice of health insurance provider); United States v. Margiotta, 688 F.2d 108, 112-13 (2d Cir. 1982) (affirming the conviction of the chairman of a local Republican committee who fraudulently arranged for his associates to receive insurance contracts with local governments); see also Daniel W. Hurson, Mail Fraud, The Intangible Rights Doctrine, and the Infusion of State Law: A Bermuda Triangle of Sorts, 38 Hous. L. Rev. 297, 305 & n.34 (2001) (citing cases).
18. Antico argues that extension of the mail fraud statute to local political corruption runs counter to the heightened federalism concerns recently raised by the Supreme Court. See Cleveland, 531 U.S. at 25 ("As we reiterated last Term, `unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance' in the prosecution of crimes."). However, Antico's argument is misplaced. While the Supreme Court recently voiced federalism concerns over the reach of mail fraud prosecutions in general in Cleveland, it acknowledged that Congress indeed spoke clearly when it restored the "intangible right of honest services" within the scope of S 1346. Id. at 20.
Moreover, we need not reconcile the principles of federalism with S 1346 in this case because Antico owed a duty to the citizens of Philadelphia under state and local law. See Margiotta, 688 F.2d at 124.

The Government's prosecutorial theory on this point is that Antico, by failing to disclose his personal interest in a matter over which he had discretionary decision-making authority, deprived the public of its right to disinterested decision-making and of its right to full disclosure of his potential motivation. The scheme to defraud involved Antico's setting Ricciardi up as an expediter, then preparing and approving her permits. Ricciardi received a fee for her "services" which, in turn, substituted for Antico's obligation to pay child support. The Government contends that the requisite intent to defraud was met, in light of this scheme, by Antico's failure to disclose the nature of his personal interest in Ricciardi's business and to recuse himself from reviewing approvals submitted by her. Finally, the Government contends, and Antico does not dispute on appeal, that interstate phone calls and mailings were made in furtherance of the scheme.

Antico argues that while "discharge of debt" of a family member may pose a conflict of interest, his "nepotistic gifting" to his girlfriend does not rise to an actionable deprivation of his honest services under the mail or wire fraud statutes. He denies that he had a financial interest in Ricciardi's business at the time alleged in the indictment because his debt, if any, had mathematically been discharged at the time of the indictment. With respect to his intent to defraud, Antico argues that he never actively concealed from his colleagues at L&I either that he had children with Ricciardi or that he set her up in the expediting business. Thus a requisite element of fraud is missing. We address each of these contentions in turn.

Honest services fraud typically occurs in two scenarios: (1) bribery, where a legislator was paid for a particular decision or action; or (2) failure to disclose a conflict of interest resulting in personal gain. Woodward , 149 F.3d at 54–55. This duty to disclose a conflict of interest arises in the private sector from the fiduciary relationship between an employer and an employee. In the public sector, the duty is oftentimes prescribed by state and local ethics laws. In the latter context,

> [a] public official has an affirmative duty to disclose
> material information to the public employer. See

26

Silvano, 812 F.2d at 759. When an official fails to
disclose a personal interest in a matter over which she
has decision-making power, the public is deprived of
its right either to disinterested decision making itself
or, as the case may be, to full disclosure as to the
official's potential motivation behind an official act. See
id. (upholding conviction of city fiduciary who failed to
disclose material information about unnecessary
spending of city money for secret enrichment of
fiduciary's friend). Thus, undisclosed, biased decision
making for personal gain, whether or not tangible loss
to the public is shown, constitutes a deprivation of
honest services.

Sawyer, 85 F.3d at 724.

We agree with the Government that Antico's duty to
disclose material information with respect to his conflict of
interest with Ricciardi arose from state and local law.
Antico disagrees, arguing that the state and local conflict of
interest laws that governed his conduct while at L&I
contained a loophole for "girlfriends." 65 Pa. C.S.A. S 402
(". . . for the private pecuniary benefit of himself, a member
of his immediate family or a business with which he or a
member of his immediate family is associated"); Philadelphia
Code S 20-607 ("nor shall any financial interest be held by
a parent, spouse, child, brother, sister or like relative-in-
law, or by any person, firm, partnership, corporation,
business association, trustee or straw party for his or her
benefit") (emphases added). We read the emphasized
portions of these statutes to include Antico's scheme with
Ricciardi. The expediting scheme with Ricciardi, while
certainly benefitting her (and at least indirectly the two
children she had with Antico), also provided a tangible
benefit to Antico: it fulfilled his ongoing child support
obligation and served as consideration in exchange for
Ricciardi's forgoing court proceedings against him. 19

_____

19. Antico's mathematical contention that his child support obligation
disappeared after Ricciardi had earned roughly $32,000 (based on the
court-ordered payment in the 1980s) ignores the ongoing and dynamic
nature of his obligation, as well as the fact that he also purchased
Ricciardi's agreement not to pursue court sanctions against him as long

27

Therefore, Antico owed the City a duty to disclose this financial arrangement, the failure of which constitutes honest services fraud.

Antico correctly notes that "the broad scope of the mail fraud statute . . . does not encompass every instance of official misconduct that results in the official's personal gain." Czubinski, 106 F.3d at 1076 (citing Sawyer, 85 F.3d at 725) (reversing conviction of IRS employee on mail fraud charges for unauthorized browsing of taxpayer files absent a showing of impartial performance of public servant's duties); United States v. Holzer, 816 F.2d 304, 309 (7th Cir. 1987) ("We do agree that the words `scheme or artifice to defraud' don't reach everything that might strike a court as unethical conduct or sharp dealing"). However, even if we were to read these conflict of interest provisions as restrictively as Antico suggests, we find that his conduct violated the fiduciary relationship between a public servant charged with disinterested decision-making and the public he serves. Id. at 307 ("Fraud in its elementary common law sense of deceit -- and this is one of the meanings that fraud bears in the [mail fraud] statute . . .-- includes the deliberate concealment of material information in a setting of fiduciary obligation. A public official is a fiduciary toward the public . . . ." ). Duties to disclose material information affecting an official's impartial decision-making and to recuse himself exist within this fiduciary relationship regardless of a state or local law codifying a conflict of interest. Id. at 309; Silvano, 812 F.2d at 759-60. Antico's exercise of his discretionary authority in both filling out and approving the applications submitted by Ricciardi without disclosing his interest in the scheme goes beyond the mere ministerial function excused in Czubinski and into the realm of interested decision-making. When coupled with the duty imposed by state and local conflict of interest

_____

as she cared for his children. Moreover, as we state later in this discussion, even if we were to disregard the child support arrangement, Antico's conduct in filling out the applications and then personally approving them for the financial benefit of Ricciardi deprives the public of the disinterested decision-making of one of its public servants, a breach of Antico's fiduciary duty to the citizens of Philadelphia.

28

laws, Antico's failures to disclose his financial business arrangement with Ricciardi and to recuse himself from taking action with respect to her applications fall within the scope of honest services fraud.

Antico also contends that "absent deceit, concealment, demonstrable public harm or other active fraud," his conviction for wire fraud cannot stand. We disagree. In the context of honest services fraud, where "undisclosed, biased decisionmaking for personal gain, whether or not tangible loss to the public is shown, constitutes a deprivation of honest services," Sawyer, 85 F.3d at 724, an active fraud or deceit is not necessary.

> [T]he courts that have accepted the notion that a deprivation of intangible rights is within the statute[ ] recognize that an active misrepresentation is not necessary. Instead, the prosecution need prove only a recognizable scheme formed with intent to defraud regardless of how that intent manifests itself in execution. For example, a public official engaged in bribery by mail need not actively make any misrepresentations in order to violate section 1341.

Frankel, 721 F.2d at 920-21. "The legal meaning of `fraud' is not limited to deceit or misrepresentation; it includes overreaching, undue influence, and other forms of misconduct." Holzer, 816 F.2d at 309. Nor is a showing of public harm required. Sawyer, 85 F.3d at 724 (". . . whether or not tangible loss to the public is shown"); Holzer, 816 F.2d at 308 ("It is irrelevant that . . . [Holzer's] conduct caused no demonstrable loss either to a litigant or to the public at large."); Silvano, 812 F.2d at 760 ("It is immaterial whether [the defendant] personally profited from the scheme or whether the City suffered a financial loss from it.") (citing United States v. Lemm, 680 F.2d 1193, 1205 (8th Cir. 1982)); United States v. Mandel , 591 F.2d 1347, 1358 (4th Cir. 1979) (approving the prosecution of allegedly corrupt politicians who did not deprive the citizens of anything of economic value); United States v. Keane, 522 F.2d 534 (7th Cir. 1975) (same).

In this case, Antico's failure to disclose his financial interest in the success of Ricciardi's expediting business

29

and his failure to recuse himself from approving the permit applications he filled out constitute "deceit" for purposes of the mail fraud statute. "[A]n official's intentional violation of the duty to disclose provides the requisite `deceit'." Sawyer, 85 F.3d at 732 (citing Silvano, 812 F.2d at 760). The fact that Antico did not conceal his relationship with Ricciardi from his co-workers does not vindicate his failure to disclose to his supervisors the conflict arising from their financial arrangement nor his failure to recuse himself from acting on the permit applications she submitted.

It also does not preclude a jury from finding Antico possessed the requisite intent to defraud the citizens of Philadelphia. Woodward, 149 F.3d at 62 ("Woodward's intent is . . . demonstrated by his failure to disclose his conflict of interest although he was required to do so."). The fact that Antico never reported any conflict of interest to his superiors while at L&I, despite his knowledge of the state and local conflict of interest laws, supports the jury's finding of intent to deceive necessary for a wire fraud conviction. In fact, Antico continued the fraudulent scheme even after L&I Commissioner Levin specifically instructed him in 1993 to have no involvement in approving Ricciardi's permit applications. Despite Levin's instructions, Antico urged Ricciardi to submit permits on behalf of the Philadelphia Sign Company, which he approved. Antico also prepared the permit application for Wizzards at this time on Ricciardi's behalf and prepared the appeal before the ZBA, signing Ricciardi's name. Finally, Antico told the owner of the Beach Club to use Ricciardi as his expediter, affirmatively promoting this scheme despite the warning of the conflict of interest.

In sum, when we view this evidence in the light most favorable to the Government, we find that it has met its burden of proof. There was clearly sufficient legal support and factual evidence, both direct and circumstantial, on which a reasonable jury could rely to reach its verdicts.

2. Materiality Instruction

According to Antico, the District Court erred by omitting "materiality" from its jury instruction on the mail fraud racketeering acts. He relies on the Supreme Court's

declaration in Neder v. United States, 527 U.S. 1 (1999), that "materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes." Id. at 25. This Court considers the totality of the jury instructions to determine "whether, viewed in light of the evidence, the charge as a whole fairly and adequately submits the issues in the case to the jury." United States v. Thayer, 201 F.3d 214, 221 (3d Cir. 1999). Because Antico did not object to the District Court's treatment of materiality, we only review it for plain error. Johnson v. United States, 520 U.S. 461, 465-67 (1997). Under Rule 52(b) of the Federal Rules of Criminal Procedure, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Fed. R. Crim P. 52(b). The Supreme Court in United States v. Olano, 507 U.S. 725 (1993), articulated the limitations on appellate review under Rule 52(b): "The first limitation on appellate authority under Rule 52(b) is that there indeed be an `error.' " Id. at 732. The second is that the error be "plain" and the third is that the error "affect substantial rights." Id. at 734. Even if these requirements are met, the court should not exercise its discretion unless the error"seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Id. at 736.

In light of the Supreme Court's holding in Neder , Antico argues that he is entitled to a new trial because, after the District Court instructed the jury on materiality with respect to the wire fraud counts and racketeering acts (Counts Eleven through Eighteen), it did not re-instruct the jury on materiality with respect to the mail fraud racketeering acts (Racketeering Acts 14A-D). In addition, Antico submits that the District Court should have specifically instructed the jury that materiality must be proven beyond a reasonable doubt. The question is whether this failure to re-instruct the jury on materiality when giving the mail fraud instruction constitutes plain error.

The District Court's instructions were carefully crafted and lengthy, spanning over 100 pages. With respect to the wire fraud counts, the Court began by defining a scheme to defraud in the context of wire fraud. It explained that the Government must prove beyond a reasonable doubt that

31

there was a "scheme or artifice to defraud," and defined a scheme to defraud as "any plan, device or course of action to obtain money or property or the intangible right of honest services by means of false or fraudulent pretenses, representations or promises reasonably calculated to deceive persons of average prudence." In describing "false and fraudulent representations," the District Court stated: "The false or fraudulent representation or failure to disclose[ ] must relate to a material fact or matter. A material fact is one which would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement in making a decision." Clearly the wire fraud instruction was adequate.[20] However, when discussing the racketeering acts of mail fraud under the RICO count, the Court did not instruct on false representations and materiality.

Preliminarily, we find Antico's case to be unlike United States v. Gaudin, 515 U.S. 506 (1995), where the Court entirely failed to present the issue of materiality to the jury. In this case, both the wire fraud and the mail fraud offenses derived from the same scheme between Antico and Ricciardi. The material information that was not disclosed by Antico was the same in both counts. Therefore, a reasonable jury, instructed to consider materiality with respect to this scheme, would logically do so in the context of both wire fraud and mail fraud. See United States v. Winstead, 74 F.3d 1313, 1319 (D.C. Cir. 1996) (concluding that where only one fraudulent scheme was at issue with respect to both mail fraud and false statement charges, the court's instruction to the jury that materiality was an element of the mail fraud charge ensured that the jury would have found this element existed with respect to the

_____

20. Antico takes issue with the wire fraud jury charge to say that "materiality" should have been instructed "beyond a reasonable doubt" in the same sentence. Because the District Court defined materiality as an element of the scheme to defraud, and explained that the scheme needed to be proven beyond a reasonable doubt, we conclude that the jury charge was sufficient in this respect. He also questions whether materiality should be subject to a "reasonable person" test in the circumstances. Neder instructs us that the reasonable person test is not error. 527 U.S. at 22.

false statement charge had the jury been properly instructed).

The District Court's instructions clearly informed the jury that, by definition, "a false or fraudulent representation or failure to disclose[ ] must relate to a material fact or matter." By convicting Antico of wire fraud, the jury found that Antico's failure to disclose was material, and "it is beyond doubt that the members of the jury would have reached the same conclusion had they explicitly considered materiality as part of their deliberations" on the mail fraud racketeering acts stemming from the same conduct. Winstead, 74 F.3d at 1321. Therefore, the District Court's jury instructions on materiality were not erroneous.

C. Scheme to Defraud Philadelphia of Property --
McCausland's Zoning Permits

In light of the Supreme Court's decision in Cleveland v. United States, 531 U.S. 12 (2000), the Government agrees that Counts Seventeen and Eighteen should be remanded to the District Court for entry of judgments of acquittal. In Cleveland, the Court reversed a mail fraud conviction of a defendant who obtained a video poker license from the state by making false representations on his license application. The Court held that an unissued video poker license was not property within the meaning of the mail fraud statute. Id. at 15.

Counts Seventeen and Eighteen charged that

> while Antico was working as a private expediter
> following his retirement from L&I, he obtained a
> zoning and/or use registration permit for Maureen
> McCausland's putative prostitution business. He
> obtained that permit by falsely stating on the permit
> application that McCausland was going to operate a
> "modeling studio/physical fitness business" in
> Philadelphia.

The prosecution of Antico on these two counts was premised on a zoning permit being property within the meaning of S 1343. Appellee's Supp. Br. at 2. Because the Supreme Court's ruling negates the Government's premise, we reverse Antico's conviction on these counts.

33

D. Sentencing Challenges

Antico alleges that the District Court erred by (1) enhancing his offense level by four levels because it determined he was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive, and (2) inflating the loss attributable to the Ricciardi scheme to defraud to over $700,000, the amount earned by Ricciardi in her expediting business. We review for clear error a District Court's factual determinations underlying the application of the Sentencing Guidelines. United States v. Helbling, 209 F.3d 226, 242–43 (3d Cir. 2000) (citing United States v. Ortiz , 878 F.2d 125, 126–27 (3d Cir. 1989)). Our review of the District Court's legal interpretation of the Sentencing Guidelines is plenary. United States v. Yeaman, 194 F.3d 442, 456 (3d Cir. 1999). Once these tests are satisfied, we owe deference to the District Court's application of the Sentencing Guidelines to those facts, as required by 18 U.S.C. S 3742(e). Helbling, 209 F.3d at 243.

The District Court grouped Antico's convictions for purpose of sentencing, placing the extortion activity in one group, U.S. Sentencing Guidelines Manual S 2(c)(1.1) (1999), and the mail and wire fraud activity in a second group, U.S. Sentencing Guidelines Manual S 2(c)(1.7). It then calculated the offense levels for each group. The extortion group led to an offense level of twenty–four and a sentence of sixty–three months, while the fraud group led to an offense level of twenty and a sentence of sixty months (to run concurrently). The District Court used the adjusted offense level of the highest group, extortion, to determine the sentencing range. Therefore, the ultimate sentence imposed by the District Court, sixty–three months, was not based on the amount of loss caused by the fraud activities. Antico's objection to his leading role adjustment pertains to the first group of extortion activities whereas his objection to the loss calculation pertains to the second group of fraud activities. The Government contends that the District Court's use of the extortion group to determine Antico's ultimate sentence renders Antico's objection to the loss calculation moot.

34

1. Organizer or Leader of a Criminal Activity of Five or
        More Participants or Otherwise Extensive Criminal
        Activity

We review for clear error the District Court's factual
determinations that Antico was an organizer or leader and
that his criminal activity involved five or more participants.
Helbling, 209 F.3d at 242-43.In simple term s, we will
vacate "only if we are left with a definite and firm conviction
that a mistake has been made." United States v. Dent, 149
F.3d 180, 189 (3d Cir. 1998). With respect to the extortion
offenses, the District Court adjusted Antico's base offense
level upward four levels for his aggravating role. Under
S 3B1.1 of the Sentencing Guidelines, a District Court
adjusts the offense level based on defendant's role as
follows:

        S 3B1.1. AGGRAVATING ROLE

        Based on the defendant's role in the offense, increase
        the offense level as follows:

        (a) If the defendant was an organizer or leader of a
        criminal activity that involved five or more participants
        or was otherwise extensive, increase by 4 levels.

U.S. Sentencing Guidelines Manual S 3B1.1."Participant" is
defined as one "who is criminally responsible for the
commission of the offense, but need not have been
convicted." U.S. Sentencing Guidelines ManualS 3B1.1,
cmt. n.1. Application note 3 adds gloss to what the District
Court should consider when determining the defendant's
role:

        In assessing whether an organization is "otherwise
        extensive," all persons involved during the course of
        the entire offense are to be considered. Thus, a fraud
        that involved only three participants but used the
        unknowing services of many outsiders could be
        considered extensive.

U.S. Sentencing Guidelines Manual S 3B1.1, cmt. n.3.

We agree with the District Court's conclusion that Antico
was an organizer or leader of criminal activity. Application
note 3 to S 3B1.1 identifies relevant factors in this
determination:

35

> Factors the court should consider include the exercise
> of decision making authority, the nature of the
> participation in the commission of the offense, the
> recruitment of accomplices, the claimed right to a
> larger share of the fruits of the crime, the degree of
> participation in planning or organizing the offense, the
> nature and scope of the illegal activity, and the degree
> of control and authority exercised over others.

Id. With respect to Meehan and Antico, Jr., the evidence supports the conclusion that he played a decision-making role in their activities with respect to extorting Wizzards and Pin Ups. Antico also supervised the Business Regulatory Unit at L&I, the unit charged with enforcing the adult cabaret ordinances. When Wizzards, Pin Ups and Teazers were shut down, Antico made the decisions and issued the orders. The District Court's findings in this regard are not clearly erroneous.

Under the "five or more participants" prong of S 3B1.1, the District Court counted the defendant and the unindicted co-conspirators of Antico, Jr. and Meehan because of their involvement in the scheme to extort Wizzards and PinUps of a financial interest in the businesses. The District Court also counted Maureen McCausland and Barbara Williams because of their extortion payments to Antico to benefit their prostitution business and expediting business, respectively. The District Court also considered "at least some of the other victims and all of the unknowing persons at the Department of Licenses and Inspections . . . in determining whether there were five or more participants." Alternatively, under the "otherwise extensive" prong of S 3B1.1, the District Court ruled that "there were the functional equivalent of five participants by reason of the use of . . . L and I personnel" (citing to Helbling, 209 F.3d at 248 ("[T]he court must determine the extent to which the services of each individual, non-participant, were peculiar and necessary to the criminal scheme . . . [and] then consider whether the sum of the participants and countable non-participants is the `functional equivalent' of five participants.")).21

---

21. The District Court apparently imported the "functional equivalency" test from the "otherwise extensive" prong into the "five or more

36

We take issue with the District Court's inclusion of
Maureen McCausland and Barbara Williams, victims of
Antico's extortion schemes, in the mix of five participants.
Extortion victims, whether they operate legitimate or
illegitimate businesses, are still victims. As this case
demonstrates, owners of illegitimate businesses such as
Maureen McCausland may be particularly vulnerable to an
L&I official's abuse of power, but they are no more
criminally responsible for the offense of extortion than
legitimate business owners. The same holds true for
expediters. The fact that their legitimate role in filling out
and hastening permit applications to L&I was corrupted by
Antico does not make them criminally responsible for being
extorted by him. In this respect, the District Court's
inclusion of both Maureen McCausland and Barbara
Williams within the definition of participant is clearly
erroneous. By its definition, only Antico, Meehan, and
Antico, Jr. may be counted.

Alternatively, the District Court ruled that Antico's
criminal activity met the "otherwise extensive" prong of
S 3B1.1, justifying a four level increase. With respect to
what constitutes "otherwise extensive," we caution that "not
every individual tangentially involved in the criminal
activity can fairly be considered in the analysis. The
purpose of the provision would rarely be achieved by
counting the unknowing services of some actors in a
criminal scenario, a taxicab driver or bank teller, for
instance." Helbling, 209 F.3d at 247 (citation omitted). To
guard against such a broad brush, we adopted in Helbling
the three-step test from United States v. Carrozzella, 105
F.3d 796 (2d. Cir. 1997), to help determine whether the
criminal activity is "otherwise extensive."

> A sentencing court must first separate out the
> "participants" as defined by Application Note 1 from
> other individuals, non-participants, who were involved

participants" determination by counting all of the unknowing persons at
L&I. We note that the "five or more participants," by definition, must
somehow be responsible criminally for the offense. Therefore, the
unknowing L&I officials are more appropriately considered in the
"otherwise extensive" determination.

37

in the criminal activity. . . . The defendant may be considered as one of the participants. The court must next determine whether the defendant used each non-participants' services with specific criminal intent. Third, the court must determine the extent to which the services of each individual, non-participant, were peculiar and necessary to the criminal scheme.

Helbling, 209 F.3d at 247-48 (citations omitted).

We add to this rule another consideration. The language of S 3B1.1 requires the court to consider the defendant's leadership role with respect to the particular offense charged. Although "all persons involved during the course of the entire offense are to be considered," this does not sanction a court taking the activities of non-participants from unrelated schemes and grouping them together to reach the "functional equivalent" of five persons. The actions or services of non-participants must all relate to the common criminal activity or scheme -- and to the offense charged. A sentencing court should take particular care in situations where like offenses have been grouped together for sentencing purposes, as was done in this case. Counting Maureen McCausland and Barbara Williams among the "functional equivalent" of five participants was clearly erroneous for this reason as well.

In light of our ruling that victims may not be considered as participants, it is unclear from the record whether the District Court properly completed the "otherwise extensive" analysis. Assuming that Antico, Meehan, and Antico, Jr., were participants, the District Court next needed to determine whether Antico used each non-participant L&I officials' services with specific criminal intent and as part of a single criminal scheme. The District Court did not make explicit findings in this regard. Citing step three from Helbling, the District Court found that the services of those L&I officials mentioned in the Government's submissions -- Thomas Simmonds, Gary Adams, Steve Gibbs, Michael Shaughnessy, Dominic Verde, and Gerald Richards-- who were used by Antico to shut down Wizzards and Pin Ups, met the "peculiar and necessary" test. However, based on the record before us, we cannot say that the District Court undertook the proper legal and factual analysis when it

38

made its "functional equivalency" determination. We therefore vacate the sentence on the extortion charges and remand for re-sentencing in accordance with Helbling and this opinion.

2. Loss Calculation

Antico also challenges the District Court's loss calculation on the mail and wire fraud offenses. In sentencing Antico on this group of offenses, the District Court employed S 2(c)(1.7)(b)(1)(A) of the Sentencing Guidelines, which reads:

> (b) Specific Offense Characteristic
>
> (1) (If more than one applies, use the greater):
>
> (A) If the loss to the government, or the value of anything obtained or to be obtained by a public official or others acting with a public official, whichever is greater, exceeded $2,000, increase by the corresponding number of levels from the table in S 2F1.1 (Fraud and Deceit).

The Commentary to S 2F1.1 defines loss as "the value of the money, property, or services unlawfully taken." U.S. Sentencing Guidelines Manual S 2F1.1, cmt. n.7. The loss calculation need not be precise; the Sentencing Guidelines require only a "reasonable estimate" based on the information available. Id. at n.8. Generally, a defendant's gain may provide a reasonable approximation of a victim's loss and may be used when more precise means of measuring loss are unavailable in determining the sentence dealing with offenses involving fraud or deceit. Id.; see United States v. Anderson, 45 F.3d 217 (7th Cir. 1995).

The District Court used the amount of $770,284 to adjust the offense level from ten to twenty in accordance with the table in S 2F1.1. The question presented on appeal is whether the District Court's loss calculation, based on the entire gain to another "acting with the public official" in honest services fraud, is clearly erroneous. The victim in this case, the citizenry of Philadelphia, lost something intangible: the honest services of one of its public officers. How should this loss be valued? Antico objects to calculating the loss from the gross receipts to Ricciardi in

39

her expediting business. Instead, he argues that the loss should be at most the estimated $31,200 child support obligation that was the motivation behind his scheme to defraud, or arguably zero in light of our decisions in United States v. Maurello, 76 F.3d 1304 (3d Cir. 1996), and United States v. Hayes, 242 F.3d 114 (3d Cir. 2001), that actual loss or actual harm, as opposed to defendant's gain, was the appropriate basis for measuring the loss.

In Maurello, this Court considered "whether money paid by clients for apparently satisfactory legal services performed by an unlicensed attorney is considered part of the `loss' from the attorney's fraudulent acts for purposes of S 2F1.1." 76 F.3d at 1308. "To the extent that the unauthorized services provided by defendant have not harmed their recipients, but to the contrary have benefitted them, we conclude that defendant's base offense level should not be enhanced." Id. at 1312. While not an exact fit, Maurello seems to reject the notion that what Ricciardi's clients paid her for her services, with which they were satisfied, is the appropriate measure of loss.

Antico also cites to United States v. Hayes, wherein we approved the Maurello approach to loss calculation. The issue in Hayes was "whether the total salary paid to Hayes in all of her fraudulently obtained employment should have been assessed as the amount of loss . . . or whether, under the rule of Maurello [citation omitted], the court should have attempted to determine whether any of the services performed by defendant had value." Hayes, 242 F.3d at 115. We held that Maurello controlled and vacated and remanded for resentencing "[b]ecause, had the District Court applied Maurello, it might have fixed a lower offense level resulting in a lesser sentence than the year and a day sentence imposed." Id.

Antico argues that the District Court should have applied the Maurello/Hayes logic in this case. Inasmuch as none of Ricciardi's clients were harmed, he insists the loss should be zero and no enhancement be applied. We reject Antico's reliance on Maurello and Hayes, which did not decide the issue of loss from honest services fraud, in favor of the clear outcome mandated by the Sentencing Guidelines in this case. "If the loss to the government, or the value of

40

anything obtained or to be obtained by a public official or others acting with a public official, whichever is greater, exceeded $2,000, increase by the corresponding number of levels from the table in S 2F1.1 (Fraud and Deceit)." U. S. Sentencing Guidelines Manual S 2(c)(1.7)(b)(1)(A). The amount Ricciardi received -- by "acting with the public official" -- is the correct measure of loss under this section. Therefore, the District Court's calculation of the loss at $770,284 was not clearly erroneous.22

In summary, we vacate the sentence imposed by the District Court in this case and remand for three reasons. First, the District Court needs to determine whether our reversal of conviction on Counts Seventeen and Eighteen has any effect on its decision to sentence within the sentencing range on the fraud grouping of offenses. Second, we vacate and remand for the District Court to conduct the necessary inquiry with respect to Antico's aggravating role in the extortion scheme, as set forth in United States v. Helbling, 209 F.3d 226 (3d Cir. 2000), and this opinion. Finally, the District Court must reconsider its decision to sentence Antico based on the extortion grouping of offenses after recalculating the sentence for each of the wire fraud group and the extortion group in accordance with this opinion.

* * * * *

Accordingly, we affirm Antico's convictions on Count One (RICO),23 Counts Two through Ten (extortion), and Counts

_____

22. The Government contends that we need not reach the question because the ultimate sentence was based on the higher offense level generated by the extortion grouping, and did not rest on the lesser offense level under the fraud grouping. Thus, even if the District Court calculated the loss as something less, the ultimate sentence of 63 months would have been imposed anyway based on the higher extortion sentence. We have addressed the fraud loss calculation because our remand to the District Court for reconsideration of Antico's sentence in light of our reversal on Counts 17 and 18 (wire fraud) and our ruling on Antico's aggravating role in the extortion scheme may affect the grouping chosen by the District Court in its ultimate sentence.

23. Antico's conviction on the RICO Count is unaffected by our reversal of Counts 17 and 18 because the McCausland wire fraud scheme was not charged as predicate racketeering acts.

41

Eleven through Sixteen (wire fraud). We reverse the conviction on Counts Seventeen and Eighteen (wire fraud). Finally, we vacate Antico's sentence and remand to the District Court for resentencing in accordance with this opinion.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

42