**UNITED STATES of America**

v.

**Jacquita D. HAYES, Appellant.**

**No. 00–2802.**

United States Court of Appeals, Third Circuit.

Argued: Dec. 19, 2000.

Filed: Feb. 20, 2001.

John H. Yauch, Lisa M. Mack, Federal Public Defender Newark, NJ, for appellant.

Robert J. Cleary, United States Attorney, George S. Leone, Assistant United States Attorney, Chief, Appeals Division, Maureen A. Ruane, Assistant United States Attorney, Newark, NJ, for appellee.

Before: BECKER, Chief Judge,
NYGAARD and FUENTES, Circuit
Judges.

## OPINION OF THE COURT

BECKER, Chief Judge.

This is yet another sentencing appeal that turns on the proper determination of loss amount under the fraud provisions of the Sentencing Guidelines, U.S.S.G. § 2F1.1. Defendant Jacquita D. Hayes, who lacked the necessary college degree to be a social worker, but who forged her qualifications and worked for several years for three New Jersey social service agencies, was convicted in the District Court of wire fraud, 18 U.S.C. § 1343, for causing one of the agencies to deposit her salary into her bank account. The sole issue before us on appeal (and the principal issue before the District Court at sentencing) was whether the total salary paid to Hayes in all of her fraudulently obtained employment should have been assessed as the amount of loss (the salary from the other two agencies being drawn in as relevant conduct under U.S.S.G. § 1B1.3) or whether, under the rule of *United States v. Maurello*, 76 F.3d 1304 (3d Cir.1996), the court should have attempted to determine whether any of the services performed by defendant had value. If the latter, the loss calculation should have been made by determining which portions of Hayes's services had value to the clients (or to the agency) and which did not.

In *Maurello*, the defendant was a lawyer who had been disbarred for ethics violations. We held that it was possible to estimate the value of the services he had performed so that the entire amount he had taken would not be charged as a loss. In the case at bar, the District Court felt that it was impossible to make the *Maurello* calculation in a situation where the defendant lacked the minimum educational requirements for the job, and it therefore assessed the full amount of Hayes's salary as the amount of the loss. However, the record establishes that Hayes received a number of quite high performance ratings, and was granted a promotion. Under these circumstances, it seems to us that the *Maurello* calculation could be made, perhaps with the aid of an expert in social work who could evaluate Hayes's files.

The Government argues that *Maurello* is distinguishable. It would have us treat Maurello as having been "qualified" for the work performed (in contrast with Hayes's lack of qualifications), as though Maurello's ethics violations and lack of a license were something of a technicality. We believe that such an approach understates the purpose of having ethics requirements for attorneys, and unduly burdens courts by forcing them to distinguish "technical" from "substantive" job requirements. Therefore, we are satisfied that *Maurello* controls. Because, had the District Court applied *Maurello*, it might have fixed a lower offense level resulting in a lesser sentence than the year and a day sentence imposed, we will vacate and remand for resentencing.

### I.

Hayes wanted to be a social worker, but to secure a position with the New Jersey

Division of Youth and Family Services ("DYFS"), she not only lied about having a bachelor's degree, but also submitted a forged diploma as proof of her educational achievement. Hayes got the job and spent the next 4–½ years as a fieldworker counseling troubled children for DYFS. Her performance is hard to gauge because DYFS does not monitor its field workers, but there were no complaints from families about her performance, and, in their reviews, her superiors praised her written assignments and case assessment skills, and lauded her commitment, enthusiasm, and hard work.[1] At some point during her employment she mentioned that she was thinking of leaving DYFS, and she requested and received a letter of reference. But she remained on the job until she was ultimately fired for falsifying documentation concerning payment to a family.

In 1995, Hayes got a job with the Youth Consultation Service of New Jersey ("YCS"), providing therapy for children before their placement in adoptive homes. To meet the educational requirements for this work, Hayes falsely claimed that she had a bachelor's degree and a master's degree. Unlike the DYFS job, Hayes was accompanied by a supervisor as she conducted her field work and received poor evaluations. Co-workers also reported that she smelled of alcohol and vomit. As a result, YCS investigated her background and discovered that she held no degrees; when confronted, Hayes promised she would bring her diploma to work in order to prove herself. She left and never returned. All told, she was at YCS for two months.

In 1996, Hayes got a job with Mentor Clinical Services ("Mentor"). Again, her duties involved counseling troubled chil-

dren, and again she falsely claimed to have the bachelor's degree and master's degree that constituted the minimal educational requirements of the job, backing-up these prevarications with forged paperwork. She even forged a social worker's license and listed her mother (without disclosing the relationship) as a professional reference. After a year, she was promoted and given a ten percent raise. There was no direct supervision of her counseling, and Mentor received no complaints. In October 1997 she was fired when Mentor determined that she had lied about her credentials. There is some dispute between Hayes and the Government regarding her precise responsibilities at Mentor: According to Hayes, most of her work at Mentor was oversight and administration, but the Government contends that Hayes had a great deal of clinical responsibility in addition to her supervisory duties.

DYFS is funded by both the federal government and the State of New Jersey. Both Mentor and YCS receive funding from DYFS and other state agencies, and both Mentor and YCS received reimbursement from DYFS for the payment of Hayes's salary.[2]

Hayes was charged with one count of wire fraud, for causing Mentor to deposit her salary into her bank account even though she was not qualified for the job. She pled guilty, and, for sentencing purposes, her fraudulent employment at DYFS and YCS was deemed relevant conduct under U.S.S.G. § 1B1.3. Thus, in order to determine her offense level under the Sentencing Guidelines pursuant to U.S.S.G. § 2F1.1, it became necessary to determine the total amount of monetary loss to the defrauded agencies.

1. Hayes did have some trouble at DYFS: She had an affair with a co-worker during working hours, was disciplined for looking at confidential records, crashed a New Jersey vehicle while intoxicated, was suspected of theft, and showed up drunk for work. These incidents did not, however, form the basis for her discharge.

2. It is not entirely clear from the record, but it appears either that DYFS is not obligated to pay the salaries of workers who do not meet minimum educational requirements, or that it has a policy against such payments.

The government argued, and the District Court agreed, that the total "loss" was Hayes's total salary for the work performed from 1990 through 1997, which was $190,298.77. This put her at offense level 13. Two levels were added for "more than minimal planning," U.S.S.G. § 2F1.1(b)(2), and two levels subtracted for acceptance of responsibility, *see* U.S.S.G. § 3E1.1. This made her eligible for 12 to 18 months' imprisonment, and the District Court sentenced her to a year and a day, plus a term of supervised release. Hayes now appeals the loss calculation, arguing that because the agencies received her services in exchange for the salary, the loss amount should be zero.

## II.

The offense is governed by the Fraud Guidelines, which explain that the offense level is to be determined by the amount of the loss. The Guidelines provide examples demonstrating that when something of value is provided in return for the loss, the "loss" valuation is equal to the difference between what was provided and what was taken. *See* U.S.S.G. § 2F1.1, cmt. n. 8(a) ("A fraud may involve the misrepresentation of the value of an item that does have some value .... Where, for example, a defendant fraudulently represents that stock is worth $40,000 ... the loss is the amount by which the stock was overvalued ...."). The application notes further provide that loss need only be a reasonable estimate, based on available information. *See* U.S.S.G. § 2F1.1, cmt. n. 9.

*United States v. Maurello*, 76 F.3d 1304 (3d Cir.1996), involved an attorney who had been disbarred for ethics violations, including witness tampering and fraudulently obtaining credit cards. In anticipation of the disbarment, the attorney set up a new law practice, assuming the names of two New Jersey bar members who were no longer practicing. After Maurello had performed services for several clients, the scheme was discovered, and he was charged with mail fraud. To calculate loss, the probation officer contacted all of his post-disbarment clients, explained the situation, and asked whether they were dissatisfied with his services; loss was then assessed by totaling the fees of those who claimed to have experienced problems. Both sides challenged this methodology: Maurello argued that the loss should be zero, and the Government wanted loss to be calculated by reference to the total fees paid by all clients (even the satisfied ones) on the theory that the services of an unlicensed attorney had no "market value." *Id.* at 1311. The District Court accepted the Government's position, reasoning that any other calculation would unfairly penalize the incompetent attorney more than a competent one, even though both had an equally evil intention. *See id.* at 1312.

On appeal, we concluded that the Guidelines's use of the loss calculations to inflate punishment beyond the base offense level is intended to capture the amount of harm caused by the crime, and it therefore is perfectly appropriate to treat the competent attorney (who has provided his clients with valuable services) differently from the incompetent one. We explained: "To the extent that the unauthorized services provided by defendant have not harmed their recipients, but to the contrary have benefitted them, we conclude that defendant's base offense level should not be enhanced." *Id.* at 1312. Because "loss" could not be calculated merely by reference to the fees charged, we sought to find an "appropriate substitute." Although we endorsed the approach taken by the probation officer, i.e., beginning with the fees of dissatisfied clients, we noted that some clients might falsely claim to have been dissatisfied in hopes of getting a financial windfall. Therefore, we required the Government to demonstrate that the complaints by such clients were "bona fide" and capable of reasonably supporting a loss determination. *See id.* at 1313. We reversed, but concluded by observing that if, on remand, the District Court was still convinced that

a mere reference to the amount of monetary "loss" failed to capture the seriousness of the offense, the court could apply an upward departure in accordance with 2F1.1's instruction that "[i]n cases in which the loss determined ... does not fully capture the harmfulness ... of the conduct, an upward departure may be warranted." *Id.* (quoting U.S.S.G. § 2F1.1, cmt. n. 11).

Hayes, of course, argues that her case is just like *Maurello.* However, the District Court believed, and the Government agrees, that *Maurello* was different because: (1) the actual value of the lawyer's services could be assessed; (2) the clients were available to comment on the services; and (3) there was no allegation that the defendant's skills as an attorney were deficient. In contrast, the "clients" that Hayes serviced—the abused children—cannot be surveyed, for they are fragile and unlikely to complain. Moreover, the agencies might be reluctant to confess to the children and their families that an unqualified worker was counseling them; at a minimum, such actions would be an invitation to a lawsuit. As a result, the District Court held that the value of Hayes's services could not be assessed, and that the best estimate would be the entire amount of her salary. The court also declined to consider evidence that some employers had given Hayes positive evaluations, although we are not entirely clear whether the evidence was rejected as non-probative of the issue of valuation, or as irrelevant because the "value" of services provided was not germane to sentencing.

In reaching its conclusion, the District Court relied in part on *United States v. Geevers,* 226 F.3d 186 (3d Cir.2000). Geevers pled guilty to bank fraud via use of a check kiting scheme. In that case, the District Court held that the loss Geevers had intended to cause could be ascertained by reference to the full face value of the checks, despite Geevers's argument that no reasonable check-kiter could really ex-

pect to get away with that much. On appeal, the panel affirmed, concluding that Geevers's *expectations* were not equivalent to his *intent*—that is, Geevers was trying to get away with whatever he could manage, and the fact that he might have understood that at some point the scheme would fail did not mean that his *intention* was different. Further, the panel believed that Geevers's intent was a factual question in which a prima facie case could be made out for the Government by showing the face amount of the checks, and that the burden would then shift to Geevers to show that he had intended to take less than those amounts. *See id.* at 193. In Hayes's case, the District Court noted that Hayes "knew what she was doing here. She received whatever income she received ... knowing full well that she was not qualified...." The court therefore believed that Hayes's scheme was like Geevers's deliberate attempt to defraud the banks of the face value of the checks.

■ In analyzing the District Court's determination, we must first decide the proper standard of review. The government contends that review is deferential because the District Court reached a factual conclusion that, in light of the difficulty with collecting evidence, the value of Hayes's salary is the best estimate of the loss. We disagree. As we see it, what happened was as follows: (1) Hayes claimed that it was the Government's burden to establish loss a la *Maurello;* (2) the District Court held that the *Maurello* rule was inapplicable, and that this case was more like *Geevers* because Hayes "knew" she was applying for a job for which she was unqualified; and (3) the court further felt that *Maurello* was inapposite because the court did not see how it would be possible to interview clients to gather evidence of dissatisfaction as *Maurello* required. Under these circumstances, we agree with Hayes that the real issue presented is whether loss must be determined within the *Maurello* framework, a legal

question over which we have plenary review.

### III.

The Government's argument in essence is that: (1) the *Maurello* panel applied a presumption that the services provided were valuable *because* Maurello was qualified (if unauthorized) to provide them; (2) once that presumption had been established, the Government then had the burden to show that the services were not valuable; and (3) no such presumption need be given in a case like Hayes's because she was unqualified to perform the service. We find this analysis flawed.

The burden was on the Government in *Maurello* because the burden is *always* on the Government to establish actual loss. *See, e.g., United States v. Evans,* 155 F.3d 245 (3d Cir.1998); *United States v. Dickler,* 64 F.3d 818 (3d Cir.1995). Maurello was disbarred for ethics violations; in other words, he was legally declared to be *unfit* to practice law. Yet the government would have us treat him as "qualified," as though Maurello's ethics violations and lack of a license were something of a technicality. Such an approach, we think, understates the purpose of having ethics requirements for attorneys, and forces courts to distinguish between "technical" and "substantive" job requirements. There was certainly nothing in the *Maurello* opinion to suggest that the result would have been different if Maurello had not held a law degree: "A client who obtains a satisfactory contract ... has received something of value, irrespective of whether the lawyer was licensed at the time. The services rendered do not become worthless if the client later learns that the attorney was not licensed to practice...." *Maurello,* 76 F.3d at 1311.

Hayes worked for DYFS for nearly five years, and received several positive evaluations. She came to Mentor with nearly five years' experience, and was promoted and given a raise. The Government conceded at sentencing that "[s]ome of her services appear to be absolutely helpful," when advising the District Court to sentence Hayes to the lower end of the range. Certainly this is enough evidence to demonstrate that Hayes intended to provide, and did provide, actual services in exchange for her salary, necessitating that an inquiry be conducted as to the value of those services.

Another way of conceiving the problem is that in *Maurello,* the Government had the burden of proving that the mere fact of a lack of a license meant that the services were valueless. In Hayes's case, then, the burden is on the Government to show that the fact of a lack of academic credentials means that the services rendered were valueless, and it did not. Rather than conceiving of *Maurello* as a case in which the burden shifted to the Government, we think the more appropriate question is why the burden in *Geevers* shifted to the defendant. The answer to *that* question is simply that Geevers wrote bad checks, without intending to give anything at all in return; Geevers certainly never argued that he had planned to return the money, or provide something of value in exchange. In a case like *Geevers,* it does not make sense for the Government to have to prove anything further. Hayes, by contrast, accepted her salary, but showed up to work regularly and performed services.

### IV.

■ In light of the foregoing analysis, and the fact that the record establishes that Hayes got quite a number of good ratings and a promotion, we believe that the *Maurello* calculation could be made here, perhaps with the aid of an expert in social work who would evaluate her files.[3] We do not suggest that a file analysis will yield an exact calculus, but neither did the survey of client satisfaction in *Maurello,* and there is no reason to believe a file

**3.** There are, of course, other approaches that the District Court might utilize.

analysis (or some other measure the District Court may devise) will not be at least as accurate. None of this is to condone Hayes's criminal conduct (any more than Maurello's), but at this stage, what is at issue is not culpability, but quantification of loss, as dictated by the Guidelines regime.

We therefore conclude that the judgment must be vacated and the case remanded for resentencing.[4] We intimate no view as to what the outcome on remand should be. We hold only that, under the present circumstances, the District Court should have attempted the loss calculation. We acknowledge that, if the District Court is satisfied that the ultimate calculation does not adequately capture the amount of the loss,, it may depart upward. *See* U.S.S.G. § 2F1.1, cmt. n. 11. We also add that we do not suggest that the District Court will always be able to calculate loss in cases of this genre, only that it seems possible to do so here.

We acknowledge that district judges may view this case (and indeed *Maurello*) as imposing on the already cumbersome Guidelines sentencing process an expensive, time consuming, and elusive additional burden. Although we sympathize with such objections, and respond "touche," the responsibility for this state of affairs does not rest with us but rather with a sentencing regime that insists upon assessing penalties by the mechanical quantification of harm rather than by a qualitative, albeit subjective, evaluation of blame. It may be relatively simple to quantify the use of illegal drugs by measuring drug purity quality. It has proven much more difficult to quantify loss, as the rough statistic in the margin reflects.[5]

This result once again demonstrates the deep flaws of a system that creates a hulking superstructure of regulation when the simple extension of a modest amount of additional discretion to our extraordinarily able and dedicated cadre of district judges would do the job better. *See Unit-*

---

**4.** We note in this regard that the other approaches suggested by the Government—calculating loss on the basis of gain to the defendant or diversion of government program benefits—are unavailing. The application notes to the Fraud Guidelines mandate that with respect to government benefits, "loss is the value of the benefits diverted from intended recipients or uses." U.S.S.G. § 2F1.1, cmt. n. 8(d). This instruction seems geared towards dealing with people who actually take money out of government programs, and is particularly concerned with directing courts to look at what the money was to pay for or where the money was supposed to go, *in contrast* to an approach that would focus on where the money was coming from (i.e., the Government). For instance, that Guideline may be invoked when someone exchanges cash for food stamps and then redeems the stamps from the Government: If a regular "loss" calculation were used, there might be almost no loss at all, because the Government pays out the same amount (face value of the stamps) that it might have done otherwise, and the money actually ends up in the hands of the intended recipients (poor people) by virtue of the fact that they sold their stamps. In contrast, the Guidelines's focus on *intended* use ensures that the face value is the full loss, because the money was

*intended* to go for food, not cash, to the stamp recipients. *See United States v. Griffin,* 215 F.3d 866 (8th Cir.2000).

We have held that the defendant's gain may be substituted for the victim's loss when "loss" is difficult to quantify. *See United States v. Dickler,* 64 F.3d 818, 826 (3d Cir. 1995). However, as we have observed, such an approach is appropriate because it bears some rational relationship to the loss calculation. *See id.* In determining the defendant's gain, the court must also decide whether the net or gross gain is the more appropriate measure, based on whether the defendant's "costs" also bear a relationship to loss valuation by conferring a benefit on the victim. *See id.* at 829 n. 13. In this instance, Hayes's "costs" came from the effort and work she put in to her job; but the court cannot determine whether such "costs" bear a relationship to the loss incurred by the social service agencies without first attempting to calculate whether Hayes provided value to her employers. Such an approach, however, puts us right back where we started.

**5.** A Westlaw search conducted on January 16, 2001 yielded 1,709 federal cases addressing loss calculations under the Sentencing Guidelines.

*ed States v. Walker*, 202 F.3d 181, 182 n. 1 (3d Cir.2000). However, we are bound as judges of the Third Article to carry out the mandate of the Congress and the United States Sentencing Commission. Because this is a case in which we believe that it has been amply demonstrated that Hayes provided some value to the agencies and that her full salary cannot therefore be termed "loss," we have no choice but to vacate the judgment and remand for further proceedings consistent with this opinion. It is so ordered.