

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-25-2003

# USA v. Cherry

Precedential or Non-Precedential: Non-Precedential

Docket No. 02-2509

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"USA v. Cherry" (2003). *2003 Decisions.* Paper 254.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/254

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 02-2509

_____

UNITED STATES OF AMERICA

vs.

HITESH CHERRY,

Appellant

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(D.C. Criminal No. 00-cr-00094)
District Judge:  The Honorable Sylvia H. Rambo

_____

Submitted Under Third Circuit LAR 34.1(a)
January 24, 2003

BEFORE: NYGAARD, AMBRO, and LOURIE,* Circuit  Judges.

(Filed September 25, 2003)

_____

OPINION OF THE COURT

_____

_____

* Honorable Alan D. Lourie, Circuit Judge for the United States Court of
Appeals for the Federal Circuit, sitting by designation.

NYGAARD, Circuit Judge.

The Appellant, Hitesh Cherry, pleaded guilty to conspiracy and mail fraud and was sentenced to thirty months in prison. The District Court determined the amount of loss to be between $500,000 and $800,000 and upwardly adjusted the sentence by ten levels pursuant to U.S.S.G. §2F1.1. Cherry appeals the District Court's determination of the amount of loss. Because the District Court did not clearly err in its determination of the amount of loss, we will affirm.

The parties to this case, counsel, and the District Court are all familiar with the facts and procedure of this case. Therefore, as we are writing a non-precedential opinion and only for the parties herein, we recite only such facts necessary to our holding. Cherry was a development engineer and manager with AMP, Inc. In 1990, Cherry proposed that AMP develop a new electrical current transmission and distribution connection system for electrical utilities. Over the next five years, Cherry outsourced much of the work on these new products to two companies, American Equipment Testing (AET) and Innovators International Inc. (III). Unbeknownst to AMP, and in violation of AMP's Global Code of Conduct, Cherry indirectly owned both AET and III. AET was a fictitious-name company registered to Cherry's wife, created solely for the scheme. It did not own any facilities, and did not have employees other than Cherry and his wife. III was incorporated in Maryland and consisted of only a post office box, contrary to Cherry's assertions that it was qualified contractor. Between 1991 and 1995 AET

2

conducted some work related to the development of the new products, but did so using AMP employees under the direction of Cherry. AMP paid AET $677,260 and III $132,075 before the fraud was discovered.

At the sentencing hearing, Cherry contended that because AET did expend funds to rent space and for equipment, and did conduct testing of the products, which resulted in data for AMP, it suffered no loss. Cherry argues that the data from the testing has value for AMP and it simply needs to complete the testing process to reap the benefit of his work. In contrast, the government points to AMP's judgment that the work done by AET and III resulted only in intangible assets that have no value to the company.

At the sentencing hearing the District Court heard testimony concerning the amount of loss. Cherry's supervisor at AMP testified that AET's work did not result in a marketable product. App. at 71–73; PSR at 4. Cherry contends that AET purchased or made testing equipment at a cost of over $200,000. App. at 109. This equipment was apparently all eventually given to AMP, App. at 54–55, and the government concedes that there may be some value to AMP for the equipment. App. at 99. Cherry provided a list of the AET's expenses, which allege to account for almost all of the money paid by AMP. App. at 108. However, the government argued that Cherry's proffered expenses for AET are not credible and are belied by the I.R.S.'s analysis of the Cherrys' finances. App. at 95. An I.R.S. review of the Cherrys' financial records suggests that they used over $500,000 of AET and III funds for personal expenses. PSR at 4.

The District Court's conclusion of what constitutes loss under the Sentencing Guidelines is subject to plenary review, while factual findings as to the amount of loss are reviewed for clear error. *See United States v. Brennan*, 326 F.3d 176, 194 (3d Cir. 2003) (citation omitted). Because this case concerns only the District Court's calculation of the amount of loss, we will only reverse if the calculation is clearly erroneous. The amount of loss need not be exact, it "need only be a reasonable estimate, based on available information." *United States v. Hayes*, 242 F.3d 114, 117 (3d Cir. 2001).

Although the District Court recognized that the amount of loss was difficult to determine, in light of the testimony presented at the hearing, its determination that the loss was in excess of $500,000 was not clearly erroneous. AMP paid Cherry's shell companies over $800,000 to develop and test products that it never received. In its business judgment, the data produced by AET was worthless to AMP. Just as the loss to AMP cannot be calculated based solely on its expenditures, *see* U.S.S.G. §2F1.1 n.8 (noting that where the fraud involves misrepresentation of the value of an item, the actual value may offset part of the loss), neither can Cherry assert that *his* alleged expenses directly translate into value for AMP. Unlike *United States v. Maurello*, 76 F.3d 1304 (3d Cir. 1996), and *Hayes*, the District Court did credit Cherry in the loss calculation by finding that the loss was below $800,000, it simply did not grant Cherry the full credit he

4

was seeking.  The District Court's estimate of loss was reasonable and not clearly erroneous, therefore we will affirm.

/s/ Richard L. Nygaard
Circuit Judge

AMBRO, <u>Circuit Judge</u>, dissenting

I believe that the District Court did not touch the bases in holding that the Government established by a preponderance of the evidence that Cherry caused at least a $500,000 loss. Thus, I respectfully dissent from the majority's judgment in favor of the Government.

## A. It Is Unclear That Cherry's Expenditures Were Illegitimate.

There is conflicting evidence in the record concerning the amount of AMP's loss. The District Court appeared to credit the Government's side of the story, without explaining why it disbelieved Cherry.

As the majority notes, the Government's loss calculation was based primarily on the Pre-Sentence Report ("PSR"), which refers to an IRS audit. The PSR states:

> In December 1995, the IRS executed a search warrant on the Cherry's residence and recovered records of the fraudulent invoices and other financial records. Analysis of the financial records showed that the AMP receipts were deposited into AET accounts at Fulton Bank by the Cherrys, and into the III accounts at the First National Bank of Maryland . . . . These AMP payments were the only income of AET and III. Checks were then written from the First National Bank of Maryland account . . . and deposited into the Fulton Bank account of AET. Hema Cherry subsequently wrote

checks from the Fulton Bank account to pay her American Express bills and to herself, which she then deposited into her own account at Harris Savings (now Waypoint Bank). The Harris Savings funds, along with Hitesh Cherry's AMP salary from an account at Corestates Bank, were commingled to pay for personal expenses. These included vacations to Hawaii, Jamaica, Acapulco, the Grand Canyon, California, and India, as well as extensive renovations and additions to the Cherrys' home. The couple also dined out extensively. A review by the case agent of the Cherrys' income and expenses suggests that of the approximate[ly] $800,000 received by AET and III, between $500,000 and $600,000 was used by them for personal expenses.

However, in the appendix to his brief, Cherry provides a detailed schedule of expenses indicating that $718,107 of the more than $800,000 AMP paid to AET and III represents legitimate business expenses. Moreover, he noted that the Government specifically identified only approximately $180,000 worth of personal expenses, despite the contrary statement in the PSR.

Thus, there appears to be a discrepancy between the PSR – which claims that most of the AMP-derived funds were used for the Cherrys' personal expenses – and the appendix Cherry submitted – which indicates that most of the funds were legitimately expended. The District Court did not address, much less resolve, this discrepancy. The

2

Government offered to show the District Court the Cherrys' financial records, but the Court never looked at the records and therefore never confirmed the soundness of the Government's loss-calculation analysis. We have no basis to conclude whether the Government or Cherry is correct as to how the funds at issue were expended.

**B. It Is Unclear That AET's Work Was Virtually Worthless.**

The Government also justifies the loss figure by arguing the design and testing work AET performed was virtually worthless, even if Cherry did not divert the funds to his personal use. It asserts that testing is only valuable if performed by a trustworthy source and, because of Cherry's fraud, AET was not trustworthy. In any event, the Government argues that AET never performed the final qualification testing on the the two products AET contracted to design – Suregrip and Camflex.

Cherry disagrees, contending that AET provided valuable design and testing services that benefitted AMP, even though AMP ultimately decided not to produce Suregrip and Camflex. He also argues that AET never contracted to perform qualification testing and that AMP's decision ultimately not to produce Sureflex or Camflex was not due to his fraud. He points to the testimony of an employee of both AMP and AET, Daniel Nardone, who stated that "[q]ualification testing could have been conducted on Camflex within one or two months. Suregrip would have been ready within six months." Cherry also introduced into evidence a report from Richard D. Brugger, a consulting engineer, who opined that "[t]he AET test equipment is capable of reliably

performing the tests which were required in the accumulation of data for Research & Development needs" and that "[t]he test procedures used at AET are appropriate for the production of data as intended for R&D design guidelines."

Because neither party introduced any tangible evidence concerning the value of the work AET performed, the District Court's valuation of AET's services reflected what was in essence its resolution of a credibility contest between the Government's witnesses and Cherry's witnesses. The Court did not explain why it resolved the dispute in favor of the Government. It instead provided a conclusory, one-sentence explanation for the § 2F1.1 sentence enhancement – "The government has a preponderance standard. I think if we consider everything, I cannot go under the $500,000.00 figure and justify it at this point." This explanation for enhancing Cherry's sentence under § 2F1.1, given the parties' sharp disagreement over both the amount Cherry diverted to personal use and the value of AET's services, is self-evidently inadequate. *See United States v. Evans*, 155 F.3d 245, 253 (3d Cir. 1988). ("The district court made only a conclusory one sentence statement regarding its loss determination. Although the district court's determination need not be exact[,] . . . we should not be asked to rummage through the entire record without guidance from the district court as to the legal and factual basis for its determination.").

I would therefore remand for resentencing and thus respectfully dissent.

4