### UNITED STATES of America

#### v.

**Kenneth MITAN, also known as John Hill also known as Police Officer, Sgt. John Miller also known as John Thompson also known as John Adams Kenneth Mitan, Appellant.**

#### No. 10–2192.

United States Court of Appeals, Third Circuit.

Argued April 19, 2012.

Opinion Filed: Sept. 21, 2012.

Ann C. Flannery, Esq., Argued, Philadelphia, PA, for Appellant.

Scott M. Cullen, Esq., Argued, Joseph J. Khan, Esq., Argued, United States Attorney's Office, Philadelphia, PA, for Appellee.

Before: VANASKIE, BARRY and CUDAHY,* Circuit Judges.

## OPINION

VANASKIE, Circuit Judge.

Kenneth Mitan appeals his conviction and sentence arising out of his conduct in purchasing several business entities. He claims error in a number of respects, including government misconduct in monitoring his phone calls from prison while he was proceeding *pro se* and the calculation of the loss amount under the pertinent sentencing guidelines provisions. Discerning no error that undermines the validity

---

\* Honorable Richard D. Cudahy, Circuit Judge for the United States Court of Appeals for the

of his conviction or sentence, we will affirm.

## I.

On December 18, 2008, a grand jury sitting in the Eastern District of Pennsylvania returned a six-count indictment charging Kenneth Mitan ("Mitan"), along with his father Frank Mitan, Bruce Atherton, and Charro Pankratz with conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349 (Count I). It further charged Mitan and his father with mail fraud and aiding and abetting, in violation of 18 U.S.C. §§ 1341 and 2 (Counts II and III), and wire fraud and aiding and abetting, in violation of 18 U.S.C. §§ 1343 and 2 (Counts IV and V). Mitan was also individually charged with using a fictitious name in the course of a fraud, in violation of 18 U.S.C. § 1342 (Count VI). On April 23, 2009, the grand jury returned a Superseding Indictment ("Indictment") reasserting Counts One through Six, and adding an additional charge against Mitan for making a false statement before the Court, in violation of 18 U.S.C. § 1623 (Count VII).

According to the Indictment, between June 2005 and January 2008, the defendants:

> [V]ictimized small-business owners in the Eastern District of Pennsylvania and elsewhere. Using several corporate entities, the defendants identified small businesses for sale, used false and fraudulent pretenses to obtain control of those businesses, and continued the fraud long enough to drain the businesses' assets for both the defendants' personal enrichment and continuing promotion of the fraudulent scheme.

Seventh Circuit, sitting by designation.

(A.10–11.) Mitan allegedly used a false name to "negotiate[ ] to purchase" four small businesses on behalf of two corporate entities that he owned or controlled: the Williams Fund Private Equity Group ("Williams Fund") and CP Produce and Foods, Inc. "Under the terms of each deal," one of Mitan's corporate entities "acquired a controlling interest in the business through a purchasing agreement and handled day-to-day financial responsibilities, while the sellers remained on the staff of the businesses after the closing pursuant to a consultant agreement." (A.12.) Mitan would renegotiate at the time of closing, obtaining control of the businesses' finances based on promises to pay the closing costs later. The Indictment further asserts the defendants diverted funds from the businesses' accounts to themselves and their corporate entities, and these funds were "used for purposes other than the maintenance of the target businesses." (A.13.) The businesses' creditors then went unpaid following the sale, resulting in losses that forced the sellers to either regain control through arbitration or file for bankruptcy.

Pankratz and Atherton pleaded guilty and Mitan and his father proceeded to trial on Counts One through Six of the Indictment.[1] On November 6, 2009, following a four-week jury trial, Mitan was convicted on all counts.[2] On April 14, 2010, the District Court sentenced Mitan to 262 months' imprisonment, three years' supervised release, and restitution in the amount of $1,617,679.

1. The District Court severed Count Seven, which charged Mitan with making a false statement before the Court, and Count Seven was later dismissed, without prejudice.

2. Mitan's father was convicted on Counts Two through Five; he passed away prior to his sentencing.

## II.

On appeal, Mitan claims that the District Court erred by denying his motion to dismiss the indictment based on the Government's monitoring of certain telephone calls that he placed from prison.[3] In reviewing the denial of a district court's motion to dismiss the indictment, we exercise plenary review over legal conclusions and clear error review over factual findings. *United States v. Shenandoah*, 595 F.3d 151, 156 (3d Cir.2010).

Mitan, who graduated from law school but is not a barred attorney, proceeded *pro se* in the District Court. Although the Court also appointed "standby counsel" to assist with pre-trial preparation, Mitan was "purely *pro se* " until September 17, 2009, when the Court granted his request to try the case on a "hybrid representation" basis with standby counsel. Beginning on December 23, 2008 and continuing throughout the pre-trial period, Mitan was detained in the Federal Detention Center ("FDC") in Philadelphia. Mitan concedes that he was on notice from the outset of his detention that his non-legal phone calls were subject to monitoring and recording by the Bureau of Prisons ("BOP"), and that he was required to contact the FDC to request an unmonitored attorney call.

Commencing in January of 2009, the Government issued a series of subpoenas to the FDC requesting "all [Mitan's] telephone and/or written communications, excluding any attorney-client privileged communication." (A.2163–71.)[4] The Gov-

3. We exercise jurisdiction over this matter pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

4. The subpoenas also requested copies of any non-privileged communications from the accounts of "any inmate other than" Mitan with certain listed phone numbers that the Government believed Mitan would attempt to call.

ernment issued these subpoenas pursuant to its investigation of Mitan for obstruction of justice, based on evidence that Mitan's mother, Teresa Mitan, was assisting him in obstructing justice by intimidating potential witnesses.

Shortly after the Government began reviewing his calls, it listened to a call in which Mitan discussed a legal citation with his brother, Keith Mitan.[5] Since Mitan had by this time moved to represent himself *pro se,* the Government agent, "out of an abundance of caution," stopped reviewing the tapes, and Government counsel sought advice from the DOJ's Professional Responsibility Advisory Office ("PRAO"). (A.2128.) The PRAO advised Government counsel that Mitan's rights would not be violated by the agents listening to his consensually recorded, non-legal calls. Nevertheless, the Government arranged for a "taint team" to conduct a preliminary review of the recorded calls to screen for privileged communications.

On May 5, 2009, Mitan filed a motion for a protective order requesting that the BOP be precluded from disclosing to the DOJ, FBI, and USAO any of his legal defense work product, discussions with legal counsel and potential witnesses, and other material associated with his legal strategies. The Court ordered the Government to respond to Mitan's motion with a suggested protocol, and on May 11, 2009, the Court entered an Order granting Mitan's motions according to the Government's protocol. The first paragraph of the Order states:

When undertaking any communication related to his legal defense, Defendant Mitan will follow all procedures established by the [FDC] to protect the confi-

dentiality of such communications. These procedures will govern defendant Mitan's oral and written communications related to his legal defense, as well as his in-person conversations with stand-by counsel, and counsel for co-defendants during legal visits at the [FDC].

(A.2076–77.) Based on this protocol, Mitan claims that he believed he could place calls pertaining to his legal defense on the FDC's non-attorney phone lines, and that any BOP recordings of these calls would not be disclosed to the prosecution.

The Government, however, interpreted the May 12, 2009 Order as dispensing with the need for a "taint team." The Government concluded that "this order clearly placed defendant Mitan on additional notice that he was required to follow established FDC procedures to protect any communications for which he wished to claim legal privilege or work product protection." (A.2129.) Investigating agents continued to review Mitan's calls from this time forward, and reviewed a total of 75 recorded calls, all but one of which were between Mitan and his mother or brother. (A.2130–31.)

In June 2009, Mitan filed a motion to extend the May 12, 2009 Order to communications with experts and witnesses, based on his concern that the prison's recordings of his communications with these individuals could be disclosed to the Government. At this time, neither Mitan nor the Court knew of the Government's ongoing review of Mitan's recorded conversations with his family members. On July 28, 2009, the Court denied Mitan's motion as unnecessary, explaining:

(A.2163–71.) This list often numbers included the numbers of Mitan's family members and others who participated in the business transactions charged in the indictment.

5. Keith Mitan is a licensed attorney who practices in Michigan, and represented the Williams Fund. Keith Mitan, however, did not represent his brother Kenneth in this case.

Individuals detained in prison send and receive numerous communications with their counsel and with investigators every day, and prison regulations prohibit prison officials providing this information to law enforcement personnel. There is no need for a protective order in this particular case, and if the Court were to grant one, then similar protective orders, by implication, would be required in every criminal case, which would be an unnecessary burden on the administration of criminal justice. Mitan does not have any grounds to believe that the government has, in any way, interfered with this right to communicate with his investigators.

(A.2082–83.)

Mitan and the Court did not learn about the Government's review of Mitan's calls until the end of August 2009. In September 2009, Mitan moved to dismiss the indictment on the ground that the government violated his Sixth Amendment rights by monitoring his phone calls with his mother and brother, which he claimed were legally protected communications. Mitan asserted that Keith and Teresa were potential trial witnesses because Keith was the attorney for the Williams Fund and Teresa was connected to a corporate entity used to funnel funds from the charged transactions to the defendants. Mitan also asserted that his discussions with Keith concerned "legal strategy and issues, including legal authority and arguments for Mitan's pleadings and discussions of who Mitan should call as witnesses at trial." (Appellant Br. at 34.) For these reasons, he claimed that the calls were protected by the attorney-client privilege and attorney work product doctrine, and thus that the Government's monitoring "intruded on his trial preparations, in violation of his Sixth Amendment rights to prepare his defense." (A.2152.)

The District Court held that these calls were not protected by the attorney-client privilege or work product doctrine, but found that the government's monitoring did implicate Mitan's right "to prepare his defense with communications with witnesses, investigators, and experts without knowledge of the prosecutors in this case." (A.2214.) Revealing its displeasure with the Government's lack of candor, the District Court "expresse[d] some serious concerns that the government did not disclose, even in an ex parte filing ... the monitoring of [Mitan]'s telephone conversations when it prepared the protocol." (A.2213). This was the very same protocol which, though issued as a result of granting a protective order, the Government interpreted to strip Mitan of the protection provided by the use of a taint agent. The District Court noted that this "issue[ ] ... could have been avoided by the government continuing the use of the taint agents throughout this matter and/or filing ex parte notice to the Court that this monitoring was taking place." (A.2216).

Concluding, however, that Mitan was not entitled to the extreme sanction of dismissal of the indictment if his defense was not prejudiced by the government's conduct, the District Court reviewed recordings of five of the monitored calls that Mitan argued were illustrative of the prejudice to his defense. The District Court found that they revealed no specific "defense strategy, planning, or other confidential matters pertaining to the trial," and thus concluded that Mitan was not prejudiced by the government's conduct. (A.2248.)

Mitan argues that the Court erred by requiring him to demonstrate prejudice, contending that:

No one phone call ... of the hundreds recorded and no one trial decision the government made can be held up [to] demonstrate the prejudice to Mr. Mitan.

It is impossible to know how the government may have consciously or subconsciously changed its trial preparation or trial strategy after having listened extensively to Mr. Mitan discussing his case.

(Reply Br. at 29.) Mitan therefore concedes that he cannot prove prejudice, but submits that he is entitled to a presumption of prejudice under *United States v. Levy*, 577 F.2d 200 (3d Cir.1978).

*Levy* presented us with the "complex and difficult problem of the joint legal representation of two criminal defendants, one of whom, unknown to the other defendant or to the lawyer representing them, was a government informer." *Id.* at 202. We held that "[w]here there is a knowing invasion of the attorney-client relationship and where confidential information is disclosed to the government ... there are overwhelming considerations militating against a standard which tests the sixth amendment violation by weighing how prejudicial to the defense the disclosure is." *Id.* at 208.

*Levy* crafted a three part test examining: (1) intentional government conduct, (2) attorney-client privilege, and (3) the release of confidential legal strategy. When those circumstances coalesce, *Levy* dispenses with an inquiry into whether the defense was prejudiced.

■ Assuming that the presumption of prejudice approach adopted in *Levy* remains viable,[6] Mitan cannot avail himself of it because he cannot show that the government intentionally invaded any attorney-client relationship. On the contrary, while

---

6. *Levy* was decided less than two years after the Supreme Court addressed a claim that the Sixth Amendment guarantee of effective assistance of counsel had been violated by certain government conduct that intruded into the attorney-client relationship. *See Weatherford v. Bursey*, 429 U.S. 545, 556–58, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). In *Weatherford*, the Court held that a government informant's attendance at several attorney-client strategy sessions did not violate the defendant's Sixth Amendment rights because there was "no tainted evidence [at trial], no communication of defense strategy to the prosecution, and no purposeful intrusion" by the informant into the lawyer-client relationship. *Id.* at 558, 97 S.Ct. 837. The Court commented, however, that when attorney-client conversations occur in the presence of an informant "thought to be a confederate and ally," a defendant "would have a much stronger case" for a Sixth Amendment violation if, for example, the informant testified about the conversations at trial, the conversations were the source of the government's evidence, or if they were "used in any other way to the substantial detriment" of the defendant. *Id.* at 554, 97 S.Ct. 837. In *Levy*, we held that *Weatherford* thus did not impose an "actual prejudice" test. 577 F.2d at 210. Our interpretation of *Weatherford* in *Levy*, however, was called into question just two years later when the Court declared in *United States v. Morrison*, 449 U.S. 361, 365, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981), that "absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the [Sixth Amendment] violation may have been deliberate." In *Shillinger v. Haworth*, 70 F.3d 1132 (10th Cir.1995), the Tenth Circuit noted that *Morrison* had left open the question of whether "intentional and unjustified intrusions upon the attorney-client relationship may violate the Sixth Amendment even absent proof of prejudice." *Id.* at 1140. Some courts of appeals have decided that, in light of *Morrison*, an intentional intrusion into the attorney-client relationship does not give rise to a presumption of prejudice. *See, e.g., United States v. Steele*, 727 F.2d 580, 586 (6th Cir. 1984) (citing *Morrison*, 449 U.S. at 365–66, 101 S.Ct. 665) ("Even where there is an intentional intrusion by the government into the attorney-client relationship, prejudice to the defendant must be shown before any remedy is granted."); *United States v. Glover*, 596 F.2d 857, 863–64 (9th Cir.1979). We need not address the question of whether *Morrison* precludes the presumption of prejudice approach adopted in *Levy* because Mitan cannot show the factual predicate for the presumption: an intentional invasion of the defense camp.

the government made mistakes, it undertook measures to ensure that it did not invade the defense camp. If any communication concerning legal strategy was intercepted, it was unintentional—certainly far from the level of intentional invasion present in *Levy*.

Nor is Mitan entitled to dismissal of the prosecution based upon an alleged violation of the District Court's protective order. Mitan sought the Order to prohibit disclosure to the Government of his defense-related calls placed on the monitored phone line. However, even accepting his interpretation of the Order as granting this request—a claim the Government contests—and assuming that the Government's monitoring violated it, such a violation would not entitle Mitan to dismissal of the indictment. *See Morrison*, 449 U.S. at 365, 101 S.Ct. 665. In this respect, Mitan has not cited any authority for the proposition that, absent prejudice, violation of a court order warrants dismissal of an indictment.

Mitan therefore fails to demonstrate that the Government's monitoring of his phone calls warrants the extreme sanction of dismissal of the indictment. Accordingly, the District Court did not err in denying his motion to dismiss.[7]

### III.

Mitan also challenges the procedural reasonableness of his sentence. We review sentencing decisions for procedural reasonableness under an abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 46, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). We exercise plenary review over the District Court's interpretation of the Sentencing Guidelines, *United States v. Grier*, 475 F.3d 556, 570 (3d Cir.2007) (en banc), and review the Court's factual findings for clear error. *United States v. Weaver*, 267 F.3d 231, 235 (3d Cir.2001).

The Court calculated Mitan's sentence under § 2B1.1 of the Sentencing Guidelines, which applies to fraud cases and provides for a base offense level of 7 and incremental increases based on the amount of the loss. U.S.S.G. § 2B1.1(a)–(b). Such "loss is the greater of actual loss or intended loss," where "actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense," and "intended loss" is "the pecuniary harm that was intended to result from the offense." *Id.* at cmt. n. 3(a)(i)–(ii). The Government bears the burden of establishing loss. *United States v. Hayes*, 242 F.3d 114, 119 (3d Cir.2001).

█ The Guidelines provide that "[t]he court need only make a reasonable estimate of the loss" and that "the court's loss determination is entitled to appropriate deference." *Id.* at cmt. n. 3(C). When property is the object of the fraud, courts may estimate the loss based on the property's fair market value ("FMV"). *Id.* at cmt. n. 3(C)(i). In the context of § 2B1.1, the FMV is " 'the price a willing buyer would pay a willing seller' at the time of the crime." *United States v. Simpson*, 538 F.3d 459, 463 (6th Cir.2008) (quoting *United States v. Sosebee*, 419 F.3d 451, 456 (6th Cir.2005)).

The Court found that the intended loss was $5.27 million, which it calculated based on the aggregated purchase prices of the

---

7. Our opinion should not be read as approval of the Government's conduct in this case. At a minimum, the Government should have informed the District Court of its ongoing review of Mitan's recorded conversations when Mitan first sought a protective order. Absent a demonstration that the government intended to invade the defense camp, however, the severe sanction of dismissal of the prosecution is simply not warranted under the facts and circumstances of this case.

six businesses Mitan fraudulently acquired.[8] The Court reasoned that Mitan's assessments of the businesses' values were appropriate measures of the FMV and thus the intended loss, explaining that "it is a[n] appropriate inference from the jury's verdict that the defendant intended to take over these companies and ... deprive the sellers of any benefits whatsoever," (A.2825), and that he "intended to defraud the buyer [sic] of the entire amount of the purchase price." (A.2826.) The purchase prices for the six businesses totaled $5.27 million, and since there was no dispute that the actual loss was lower, the Court applied an enhancement based on $5.27 million, resulting in an 18–level increase under § 2B1.1(b)(1)(J).

Mitan also contends that the Court should have reduced the loss amount to account for payments he made to the sellers for the purchase price and the amounts he paid for business expenses while he was operating the businesses. Mitan asserts that "[o]ver $981,000 ... was paid for vendors, payroll, and other business expenses during the time the defendants controlled the[ ] four companies. Over $600,000 ... was paid to the sellers." (Appellant Br. at 37.) He contends that he should be credited for these payments pursuant to § 2B1.1, cmt. n. 3(E)(i), which states in pertinent part:

> (E) Credits Against Loss.—Loss shall be reduced by the following: (i) The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected.

Courts have recognized that " 'value may be rendered even amid fraudulent conduct,' and that in calculating intended loss, the district court should give credit for any legitimate services rendered to the victims." *United States v. Blitz*, 151 F.3d 1002, 1012 (9th Cir.1998) (quoting *United States v. Barnes*, 125 F.3d 1287, 1291 & n. 1 (9th Cir.1997)). The District Court, however, did not misinterpret the Guidelines by declining to reduce the loss amount by Mitan's payments, because perpetrators of fraudulent schemes are not entitled to credits against loss for payments that were made to perpetuate their schemes. *See United States v. Mooney*, 425 F.3d 1093, 1102 (8th Cir.2005) ("[T]he law does not favor crediting a defendant for the costs involved in his fraudulent scheme."); *United States v. Ciccone*, 219 F.3d 1078, 1087 (9th Cir.2000) ("[A] court need not deduct the cost of refunds and recoveries from the total amount taken where, as here, the services permitted the fraudulent scheme to continue."); *United States v. Whatley*, 133 F.3d 601, 606 (8th Cir.1998) ("[T]he district court found that the defendants' business was a conspiracy to commit wire fraud, and we are not inclined to allow the defendants a profit for defrauding people or a credit for money spent perpetuating a fraud."); *Blitz*, 151 F.3d at 1012 ("The refunds, however, did not constitute legitimate services.... Instead, they were a part of [the] fraudulent scheme.... [and were made] for the sole purposes of deflecting serious disruption of their schemes and making the operation look legitimate, which in turn enabled [the defendant] to defraud a greater number of victims."); *see also United States v. Hartstein*, 500 F.3d 790, 800 (8th Cir.2007) ("We believe that when a defendant's only subjective intent regarding repayments re-

---

**8.** Although the Indictment only cited four businesses, at trial the Government presented evidence about two other businesses that Mitan had acquired through the same fraudulent scheme. The Court considered this as evidence of relevant conduct and thus included the losses to these two companies when calculating the loss amount.

lates to this illegal purpose of perpetuating the scheme, a sentencing court may refuse to credit repayments against sums received from the victims.")

There is sufficient evidence to support the Court's finding that Mitan paid a select number of the businesses' creditors, while letting others go unpaid, in order to create the illusion that he was legitimately operating the businesses. This served to delay the sellers' detection of his fraud and to maintain the economic worth of the businesses, which enabled him to maximize his gains. Likewise, there is also sufficient evidence to support a finding that Mitan made partial payments to the sellers to perpetuate his scheme and avoid detection. Indeed, these payments gave the sellers false hope that Mitan would pay the remainder of the purchase price, thereby enabling him to continue siphoning off funds from the businesses and delaying the sellers' attempts to regain control. Because the evidence supports the conclusion that Mitan's payments were for the continuation of his scheme, the Court did not commit clear error by refusing to reduce the loss amount.

Mitan also argues that the Court erred in calculating the loss amount based on the face value of the purchase agreements, because these amounts "did not take into account offsets (for inventory, bank accounts, etc.) recognized by the parties at closing." (Appellant Br. at 76.) However, any error in this regard is harmless. Assuming he were entitled to a reduction based on the offsets, the value of these offsets is roughly $200,000—far short of the $2.77 million necessary to reduce the loss amount below the $2.5 million threshold. Thus, any error the Court made in calculating the loss amount is harmless, as Mitan raises no valid claims for a reduced loss amount that would affect his sentencing enhancement.[9]

IV.

We have carefully considered the remaining arguments advanced by Mitan on appeal, and find that they lack merit. Accordingly, we will affirm the judgment and sentence of the District Court.

9. Even if Mitan were entitled to credit for amounts he paid to the victims and the victims' creditors as well as the $200,000 he claims in the closing offsets, he has failed to show that his guidelines range would be lowered. In this regard, the 18–level increase applies to a loss of more than $2.5 million but not exceeding $7.0 million. Mitan has not shown that he is entitled to credits that would reduce the loss amount to $2.5 million or less. Thus, any error in declining to reduce the FMV calculation by payments made by Mitan is harmless.